MOORE, J.
|?By ah attended bill of information, the state charged Lorenzo Hampton with second degree kidnapping and aggravated flight From an officer. A unanimous jury acquitted Hampton of the first charge but convicted Hampton of the second. The court sentenced Hampton to two years’ imprisonment at hard labor and ordered him to pay a fine of $2,000, or, if in default, to serve 200 days’ imprisonment concurrently with his two-year sentence.
Subsequently, the state filed an habitual offender bill, and Hampton was adjudicated a fifth-felony offender. The court imposed a hard labor sentence of 30 years pursuant to La. R.S. 15:529.1(A)(4)(a) and ordered the sentence, to be served without benefit of parole, probation or suspension of sentence. Hampton now appeals this sentence as excessive and in error under *552 the habitual offender statute. Additionally, he alleges the trial court improperly denied a for-cause challenge during jury voir dire and improperly denied a request for a continuance.
For the following reasons, we affirm Hampton’s conviction and the enhanced sentence; however, we amend the enhanced sentence to delete the restriction on parole.
FACTS
The charges against Hampton arose from a high-speed automobile chase on the streets of West Monroe, Louisiana, on the evening of January 22, 2014. Responding to a “BOLO”[1] issued by the Ouachita Parish Sheriffs Office minutes earlier for a white, Ford Escape, Sergeant Todd | .¡Cummings, a Louisiana State Trooper, sighted a compact, white SUV traveling eastbound on Highway 34 that he believed could be the BOLO vehicle.[2] He began following the vehicle, which immediately turned right onto Wheelis Street. Cummings followed the SUV on Wheelis Street, and the suspect vehicle rapidly accelerated. Cummings believed this was an attempt to evade him, so he engaged his lights and siren, which automatically activated the unit’s dashboard camera. The suspect vehicle did not stop.
In the chase that ensued, Sgt. Cummings testified that he reached speeds of 70 mph on Wheelis Street, which had a speed limit of 25 mph. These facts were verified by the dashboard camera, which also confirmed Cummings’ testimony that the driver ran several stop signs. Wheelis Street merges into Montgomery Avenue. After the driver turned onto Montgomery Avenue, he pulled his vehicle into the driveway at 305 Montgomery. He jumped out of the vehicle and fled on foot. Sgt. Cummings stopped his police unit and chased the driver on foot. He twice fired his “Taser” at the suspect, but missed. The suspect jumped over a chain link fence and fled away, escaping capture.
Sgt. Cummings returned to the suspect’s vehicle where he discovered a passenger in the front passenger seat. The passenger identified himself as Daniel Owens or Daniel O’Neil (“Daniel”),[3] and he told Sgt. Cummings that [4the car belonged to his mother’s friend. Daniel did not identify the driver. Sgt. Cummings released Daniel after issuing him a summons for possession of a marijuana cigarette.
Later in the evening, Amber Robinson, age 22, was watching TV at her mother’s house located at 100 Prune Street in West Monroe when she received a phone call from a friend who wanted to go out. Amber left the house and went to her car which was parked at the corner of Prune Street and Phillips Street. When she opened her car door, she discovered a man in the back seat of the car. She screamed and claimed that she saw a “silver flash” that she believed to be a handgun. The man whom she later identified as Hampton told her to stop screaming. Amber said she did not run from her car because she thought Hampton was armed, and she feared for her two-year-old daughter, who was in the front room of her mother’s unlocked house.
*553 Amber testified that Hampton told her that he needed to get away because he was running from the police. He told her to drive him to Robinson Place, a residential area in Monroe. Amber testified that Hampton instructed her to take a certain route; however, she took a different route, purposely driving at an excessive speed in order to pass a police station near E.A. Conway Hospital. After passing the hospital and police station without incident, she stopped near an open field on Conrad Street and let Hampton out of her car. Hampton ran away, and she went to a friend’s house near Robinson Place and contacted her mother.
After speaking with her mother, Amber returned to her mother’s [fihouse and called the police. Shortly thereafter, West Monroe police, including Det. Ray Spoon, arrived at 100 Prune Street to interview Amber.
After interviewing Amber, the West Monroe Police Department got in contact with Sgt. Cummings, and together they determined that the driver who ran from Sgt. Cummings after a vehicle pursuit was likely the same person who hid in Robinson’s car and forced her to drive him to Robinson Place in Monroe.
Sgt. Cummings interviewed Daniel again, at which time Daniel identified Lorenzo Hampton as the driver of the white SUV. He also told Cummings that Hampton was likely at the home of his girlfriend, who lived at 1106 Milliken Street in Robinson Place in Monroe.
Sgt. Cummings, Det. Spoon and West Monroe Police Sergeant Tommy Jones went to 1106 Milliken Street in the early morning hours of January 23, 2014. They found Hampton there and arrested him. They obtained permission to search 1106 Milliken Street, and found a pair of ripped blue jeans in the trash can. No handgun or weapon was found.
While en route to the West Monroe Police Department, Hampton told Sgt. Cummings that, earlier in the evening, he was driving the white SUV, and he jumped out of the vehicle and ran. In a subsequent interview, he said he fled from Sgt. Cummings because he was driving without a license and had a record in Mississippi. Hampton said that he ripped his jeans when he ran away from Sgt. Cummings and jumped over the fence, Hampton also admitted that, after running from Sgt. Cummings, he hid in an unlocked car on Phillips Street. Hampton said that Amber Robinson did scream when she |fisaw him in the back seat of her car, but agreed to take him to Robinson Place when he told her that he was running from the police and would' pay her $20 to take him there. He denied having a silver handgun or any weapon, and denied threatening Robinson in any way. He said that he and Amber stopped at the A-l Convenience Store, where Hampton purchased a Sprite while Amber waited for him in the car. Hampton stated that Amber drove him directly to 1106 Milliken Street, and he paid her the $20.
On March 14, 2014, Hampton was charged by grand jury indictment with one count of aggravated kidnapping, pursuant to La. R.S. 14:44. The indictment bill was subsequently amended charging Hampton with one count of second-degree kidnapping, pursuant to La. R.S. 14:44.1, and one count of aggravated flight from an officer, pursuant to La. R.S. 14:108.1(C).
Hampton was tried by a 12-person jury on August 19 and 20, 2014. During jury selection, Hampton’s counsel raised a challenge for cause to juror number 96, David Law. After questioning Mr. Law, the court was satisfied that Mr. Law could render a fair and impartial verdict based on the evidence. The court denied the *554 challenge for cause, and defense counsel used one of Hampton’s peremptory challenges ■ to dismiss Mr. Law. Ultimately, defense counsel used all of Hampton’s peremptory challenges.
The jury unanimously acquitted Hampton of second degree kidnapping, but unanimously found Hampton guilty of aggravated flight from an officer. The court ordered a presentence investigation (“PSI”) and set the sentencing date. Subsequently, Hampton was sentenced to two years’ imprisonment at hard labor without the benefit of parole, probation or |7suspension of sentence and was ordered to pay a fine of $2,000 or — if in default of payment — to serve 200 days in prison, concurrently with his two-year sentence. In support of the sentence, Judge Leehy discussed the findings of the PSI, including Hampton’s criminal and social histories. Hampton’s PSI revealed a fairly lengthy criminal history.[4]
The court considered the factors outlined in La. C. Or. P.' art. 894.1, and focused particularly on La. C. Or, P. art.' 894.1(B)(5), explaining that Hampton drove recklessly through residential areas during his flight from .Sgt. Cummings, which put Cummings, Hampton’s passenger and other motorists on the road at risk of death or great bodily harm. The court said it could “find no mitigating factors that would weigh in favor of Mr. Hampton.”
Relevant to this appeal, at the conclusion of sentencing, the state requested leave to consider filing a habitual offender bill of information. The trial court set a hearing date of November 6, 2014. The court then informed Hampton regarding his appointed counsel that “if the state decides Rto file a habitual offender proceeding, Mr. Sanson is still on the hook for that. He represents you in that mat-ter_”
At the November 6, 2014, hearing, the state informed Hampton that it intended to file a habitual bill of information. Hampton requested that the trial court appoint an attorney to represent ■ him through the habitual offender adjudication.
On January 27, 2015, attorney Jay No-len was appointed to serve as Hampton’s counsel for the habitual offender hearing and subsequent adjudication.
On February 10, 2015, the state filed a habitual offender bill of information, alleging that Hampton was a fifth-felony offender. Hampton waived arraignment, and the trial court set the date of the habitual offender hearing for March 17, 2015, which was subsequently continued to May 12, 2015.
*555 On May 12, 2015,- immediately prior to the commencement of the hearing on the habitual offender bill, -Hampton and attorney Nolen made an oral motion for continuance. According to Nolen, Hampton informed him about a week prior to May 12, 2015, that he wished to retain private counsel and that Hampton’s mother and sister would provide the funds for the retainer. Attorney Nolen stated that he had reason to believe that Hampton’s mother and sister did, in fact, have the funds available, based on the fact that-they paid for private counsel for Hampton’s trial. The state objected to. Hampton’s motion.
' IsThe trial court denied the motion, stating that Hampton had been aware of the habitual- offender bill of information for more than three months, and this was the first time that the trial court had heard anything about Hampton’s desire to retain private counsel. In response, attorney Nolen, noted his objection to the trial court’s ruling, and argued that denying Hampton his right to retain private counsel was reversible error and urged the trial court to reconsider.
The habitual offender hearing was held as scheduled, and Hampton was adjudicated a fifth-felony offender. The court sentenced Hampton to 30 years’.imprisonment ‘at hard labor without benefit of parole, probation or suspension of sentence.
This appeal followed.
DISCUSSION
By his first assignment of error, Hampton alleges that the trial court improperly denied his challenge for cause against selection of prospective juror David Law. Hampton alleges that the denial of this for-cause challenge is reversible error under Louisiana law because he was forced to use one of his twelve peremptory challenges to excuse Law,. and he used all twelve peremptory challenges during jury selection.
Our review of the voir dire transcript reveals that the prosecutor asked a group of prospective jurors if .there were any questions that he failed to ask and which either he or the defendant might want to know the answer to or which might render the prospective juror not “the best juror to be selected on the- case.” Mr. Law spoke up that he had previous police Inexperience, namely, that he was employed for five years as a deputy for the Ouachita Parish Sheriffs Office. He said he did not know if this fact made him unfair or “un-impartial.”
Subsequently, Hampton’s counsel, Mr. Sanson, asked Mr, Law if the prosecutor failed to prove one of the elements of the crimes, “could [he] ... find him not guilty without any problem at all?” Mr. Law said he agreed with all that. Mr, Sanson then posed the following hypothetical to Mr. Law: “If you had to render a verdict right now, what would it be?”
Mr. Law responded: “Right now? ... I would say he’s guilty.” He explained that the reason for his answér was likely due to his past experience in law enforcement.
Mr. Law acknowledged that, as yet, there had been no witnesses. against Hampton. However, given this fact, when Mr. Sanson again asked what his verdict would be, he responded, “I don’t know.”
After the jurors were removed from the courtroom, Mr. Sanson made a for-cause challenge against seating Mr. Law on the jury on grounds that he would not follow the presumption of innocence. However, the court was not convinced that Mr. Law would not follow the law if properly instructed. Before ruling on the challenge, Mr.-Law was brought into, the courtroom for further questioning:
*556 COURT: Mr. Law, you can have a seat right here. Mr. Law, earlier when the lawyers were discussing or questioning you, you indicated to the Court or to Mr. Sanson, I believe he was questioning you that if you had to vote right now you’d vote guilty. Is that correct?
LAW: I said that, yes.
InCOURT: Alright. Now, if I explain to you and you may have already picked this up, but the Defendant is presumed to be innocent. The State bears the burden of proof. Could you follow that law? Do you agree with that law first off?
LAW: I do agree with that law.
COURT: It’s actually two. The presumption of innocence.
LAW: That’s correct.
COURT: And the State’s burden.
LAW: That’s correct.
COURT: These are constitutional concepts.
LAW: Yes, I agree with that.
COURT: It’s more than just-this is the very foundation of the law.
LAW: That’s correct.
COURT: Now, if I instructed you that the State does, bear the burden of proof and the Defendant is presumed to be innocent, does that change your answer to that question? Right now if you had to vote, guilty or not guilty? Would your answer be?
LAW: It would be not guilty.
COURT: Would have to be not guilty.
LAW: Yes.
COURT: And that’s because you haven’t heard any evidence?
LAW: That’s correct.
COURT: Um, now, when you were questioned earlier that was not your response. Is it maybe because now you’ve thought about it and maybe you understand the question more precisely?
LAW: That’s correct.
COURT: Okay. You don’t know anything about this case?
haLAW: No, I do not.
COURT: You have not formed an opinion about the Defendant’s guilt or innocence have you?
LAW: That’s correct.
COURT: Could you be fair and impartial to both the Defendant and the State in this case?
LAW: I would hope so. Yes Sir. COURT: Alright. Questions Mr. Fon-tenot?
PROSECUTOR: Mr. Law, could you return a not guilty verdict if the case isn’t proven?
LAW: Yes.
COURT: Mr. Sanson, any questions?
DEFENSE COUNSEL: No questions.
COURT: Alright. You may step down. Thank you, Mr. Law.
REPORTER’S NOTE: Mr. Law returned to the jury room.
DEFENSE COUNSEL: He was still hesitant, your Honor.
COURT: He did answer the question appropriately. The questions appropriately. So I’m going to deny the motion, challenge for cause as it relates to Mr. Law.
Although defense counsel did not lodge an objection to the ruling and articulate the grounds for the objection, Hampton now argues on appeal that the trial court’s questions and instructions about the state’s burden of proof in the above exchange allowed Law to state “what the court wanted to hear.” Presumably, Hampton is arguing that the court’s questions or manner of questioning “coached” or implicitly guided Law’s responses. He *557 maintains that the court’s denial of the for-cause challenge was reversible. error because he had to use one of his twelve peremptory challenges to |iaexcuse Law, and he used all of his peremptory challenges during jury selection.
The Louisiana Constitution, Art. I, § 17(A) guarantees a defendant the “right to full voir dire examination of prospective jurors and to challenge jurors peremptorily.” Both the defendant and the state are given twelve peremptory challenges in trials of offenses punishable by death or necessarily by imprisonment at hard labor. La. C. Cr. P. art. 799.
In addition to his constitutionally guaranteed peremptory challenges, a defendant may challenge a juror for cause on several grounds, including that “the juror is not impartial, whatever the cause of partiality,” or “the juror will not accept the law as given to him by the court.” La. C. Cr. P. art. 797. On the other hand, the statute further states:
An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.
La. C. Cr. P. art. 797(2).
A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Tucker, 2013-1631 (La.9/1/15), 181 So.3d 590; State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683. A court’s evaluation of the attributes required to qualify a prospective juror is entitled to great weight. Accordingly, his exercise of the wide discretion that determination requires will not be set aside unless it is arbitrary and unreasonable. State v. Webb, 364 So.2d 984 (La.1978).
A defendant may not assign as error a court’s refusal to sustain a challenge for cause made by him, unless he makes an objection at the time of the ruling that states the nature of the objection and grounds therefor. La. C. Cr. P. art. 800(A). Accordingly, in a challenge for cause, the challenging party has the burden of showing that a prospective juror should be excluded based on one or more of the grounds in La. C. Cr. P. art. 797. State v. White, 535 So.2d 929 (La.App. 2 Cir.1988), writ denied, 537 So.2d 1161 (La.1989).
When a defendant must utilize a peremptory challenge to correct an error in denying a challenge for cause and thereafter exercises all available peremptory challenges on other prospective jurors, a substantial right of the defendant, guaranteed by the Louisiana Constitution, is affected. See State v. Monroe, 366 So.2d 1345 (La.1978). In such instances, prejudice is presumed and automatic reversal of the conviction results. State v. Campbell, 06-0286 (La.5/21/08), 983 So.2d 810, citing State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, and State v. Ross, 623 So.2d 643 (La.1993). To warrant a reversal of a conviction and sentence, the defendant need only show: (1) the district court erred in refusing to sustain a challenge for cause; and, (2) the defendant exhausted all of his peremptory challenges. State v. Mickelson, 2012-2539 (La.9/3/14), 149 So.3d 178; see also La. C. Cr. P. art. 800.
On the other hand, a trial court’s refusal to disqualify a prospective juror is not an abuse of discretion or a reversible error if the perceived bias [ ]Sor impartiality of the prospective juror is properly remedied through rehabilitation. State v. Mickelson, supra; State v. Howard, 98-0064 *558 (La.4/23/99), 751 So.2d 783. A prospective juror can be rehabilitated if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. State v. Broadway, 440 So.2d 828 (La.App. 2 Cir.1983). Thus, even if a potential juror initially expressed doubt as to the accused’s innocence, he can serve as a competent juror if upon further questioning he demonstrates an ability to set aside such doubt and follow the law. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382 (citing State v. David, 425 So.2d 1241, 1246 (La.1983)). However, “even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably [inferred],” the juror, must be, disqualified. State v. Tucker, supra at 617 (quoting State v. Jones, 474 So.2d 919, 929 (La.1985)).
A potential juror who is associated with law enforcement duties must be closely scrutinized and may justify a challenge for cause; however, such association is not an automatic disqualification. State v. McIntyre, 365 So.2d 1348 (La.1978). A prospective juror’s association -with law enforcement is grounds for disqualification only if one might reasonably conclude that it would influence him in arriving at a verdict. State v. Rhodes, 97-1993 (La.App. 4 Cir. 11/18/98), 722 So.2d 1078. The court in Rhodes noted that Louisiana courts have generally disqualified persons who are currently actively associated with law enforcement. Id. at 1080. Conversely, [ i ^¡Louisiana courts have generally held that there is no abuse of discretion in denying a challenge for cause where “a juror’s association with law enforcement has ended by the time of trial, he has no personal knowledge of the case at hand, and he states that he can be impartial despite the prior law enforcement background.” State v. White, 535 So.2d 929 (La.App. 2 Cir.1988), writ denied, 537 So.2d 1161 (La.1989).
Counsel for Hampton did not spe-' cifically object to the court’s denial of his challenge of Mr. Law, although it is clear from the transcript he did not agree with the court’s ruling. However, even if we assume that Hampton’s counsel properly raised an objection to the ruling, we conclude, for the following reasons, that the trial court did not abuse its discretion in denying the for-cause challenge as to Mr. Law.
Mr. Law initially stated that he agreed with defense, counsel’s question that if the prosecutor failed to prove, one of the elements of the crime, he could find him not guilty without any problem. After this question, defense posed a hypothetical requiring Mr. Law to decide now, before any evidence was adduced, on a verdict. Defense counsel asked, “If you had to render a verdict now, what would it be?” Mr. Law responded that “Right now, I would say he’s guilty.” He explained that his opinion was probably due to his past law enforcement experience.
The second question by defense counsel can be construed without strain as posing a hypothetical which demands a commitment or prejudgment from a prospective juror. It is settled law regarding voir dire that “a party interviewing a prospective juror may not ask a question or pose |17a hypothetical which would demand a commitment or prejudgment from the juror or which would pry into the juror’s opinions about issues to be resolved in the case.” State v. White, 39,-745 (La.App. 2 Cir. 6/29/05), 907 So.2d 228, 231 (citing State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916). However, voir dire examination which goes to the deter *559 mination of the qualifications of prospective jurors by testing' their competency and impartiality is proper. State v. Stacy, 96-0221 (La.10/15/96), 680 So.2d 1175. In this instance, the first question clearly tested Mr. Law’s impartiality; however, the second question called for a prejudgment as to the defendant’s guilt. We disagree with defense counsel’s contention that the question merely tested Mr; Law’s acceptance of the “presumption of innocence.” Mr. Law’s answer to the first question resolved this issue.
Assuming, arguendo, that 'the question was not inappropriate, we also determine that the trial court rehabilitated Mr. Law and did not abuse its discretion by denying counsel’s challenge for-cause. Specifically, the court explained to Mr. Law. the presumption of innocence and the burden of proof. Mr. Law indicated that he understood and agreed with the law. When the court asked him if he would be able to find a defendant not guilty if the state failed to meet its burden of proof, Mr. Law answered affirmatively. Although he was previously involved in law enforcement, his responses to the court’s questions indicated his ability to be impartial as required by State v. McIntyre, supra.
Accordingly, we find no abuse of discretion in the judgment of the trial court. This assignment is without merit.
|1sBy his second assignment of error, Hampton contends that the trial court erred when it denied his request for a continuance on the day of the habitual offender hearing in order to permit Hampton to retain private counsel. According to Hampton, the trial court incorrectly stated that Hampton had been on “notice” of the habitual offender charge against him since November 2014. In contrast, Hampton argues that, although the state told Hampton it intended to file a habitual offender bill in November of 2014, Hampton did not learn of the contents of that charge until February of 2015. Hampton alleges that the time period from February to May of 2015 is not so significant of a time lapse as to deny Hampton’s assertion of his right to the counsel 'of his choosing. Furthermore, Hampton suggests that the credibility of Hampton’s request to’ retain private counsel was bolstered by Hampton’s mother and sister’s funding of private counsel during Hampton’s jury trial. Hampton argues that a continuance would not have prejudiced the state, and that the trial court should have allowed for the continuance.
The motion for continuance was made orally on the day of the habitual offender hearing;- No written motion for continuance was filed as required by La. C. Cri'P. art. 707 except in- “extenuating circumstances” sufficient to overcome the requirement. State v. Bullard, 29,662 (La.App. 2 Cir. 9/24/97), 700 So.2d 1051. The timing‘of Hampton’s motion on the day that the habitual offender adjudication was to commence is analogous to requesting new or different counsel on the day of trial.
| iaAn actíused has the right to counsel of his own'choosing to defend him on a criminal charge. U.S. Const. Amend. 6; La.' Const, art. 1 § 13. A defendant has the constitutional right to the assistance of counsel at a habitual offender proceeding. Chewning v. Cunningham, 368 U.S. 443, 82 S.Ct. 498, 7 L.Ed.2d 442 (1962). The right to choose one’s own attorney is a right .that must be exercised at a ^reasonable time at the appropriate stage in the proceedings within the framework of the criminal justice-system. State v. Leggett, 363 So.2d 434 (La.1978), A. request for new or privately retained counsel during criminal proceedings may be done via a motion for continuance. La. C. Cr. P. art. 707; State v. Leggett, supra.
*560 A motion for a continuance shall be in writing and shall allege specifically the grounds upon which it is based and, when made by a defendant, must be verified by his affidavit or that of his counsel. It shall be filed at least seven days prior to the commencement of trial. La. C. Cr. P. art. 707. Upon written motion at any time and after contradictory hearing, the court may grant a continuance, but only upon a showing that such motion is in the interest of justice. However, under extenuating circumstances, an oral motion for continuance may be sufficient. State v. Bullard, supra.
La. C. Cr. P. art. 712 “commits a motion for continuance to the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a showing of abuse [of discretion] and specific prejudice.” State v. Burns, 32,904 (La.App. 2 Cir. 2/1/00), 750 So.2d 505; State v. Gipson, 28,118 (La.App. 2 Cir. 6/26/96), 677 So.2d 544, writ denied, 96-2303 (La.1/31/97), 687 So.2d 402.
There is no constitutional right to make a new choice of counsel on the very day the trial is to begin, with the attendant necessity of a continuance and its disrupting implications, to the orderly trial of cases. State v. Leggett, supra (citing State v. Cousin, 307 So.2d 326 (La.1975); and State v. St. Amand, 274 So.2d 179 (La.1973)).
In this case, our review indicates that Hampton knew that he was going to be charged with a habitual offender bill of information in November 2014. Also in November 2014, Hampton expressly asserted his preference for appointed counsel. On February 10, 2015, he was informed of the precise allegations contained in the habitual offender bill of information. Thus, Hampton had six months from the time he learned that the state was going to file a habitual offender bill, and nearly three months from the time the state filed the habitual offender bill of information, to request or retain private counsel before the scheduled May 12, 2015 hearing. Even though the trial court denied Hampton’s motion for a continuance of the habitual offender adjudication, the judge told Hampton he had the opportunity to retain private counsel to represent him during Hampton’s habitual offender sentencing. Hampton’s explanation of the delay in requesting private counsel — his eleventh-hour decision to take the habitual offender proceeding “seriously” — is not part of the trial court’s calculus in ruling on a motion for continuance to allow defendant to retain private counsel, especially on the day of the habitual offender adjudication.
1 ¾1 We find no abuse of discretion by the trial court denying the motion for a continuance. This assignment is without merit.
By his third assignment of error, Hampton argues that the trial court erred by imposing a constitutionally excessive sentence of 30 years at hard labor. Notwithstanding the sentencing court’s consideration of a PSI and the aggravating and mitigating circumstances as required by La. C. Cr. P. art. 894.1, he argues that the court impermissibly substituted its own judgment for that of the jury and punished Hampton for the second degree kidnapping offense of which he was acquitted. According to Hampton, the trial court used the habitual offender proceeding to “effectively impose a punishment for an offense that resulted in an acquittal.” Hampton also argues that the trial court’s imposition of a 30-year sentence was not tailored to the facts of the crime of conviction because the trial court relied on facts of the second degree kidnapping charge of which Hampton was acquitted.
Our review of the sentencing transcript reveals that the trial court adequately con *561 sidered the factors outlined in La. C. Cr. P. art. 894.1.[5] The court also noted that the defendant was acquitted of the crime of second degree kidnapping. Referring to that offense, the court stated:
[Although the court is not punishing him for that but is considering that in sentencing, in that the court believes that, at the very least; the burden was met as to the civil standard of preponderance of the evidence; probably higher than that. The jury didn’t find the defendant guilty but the court has considered that there was strong evidence to believe that he did, in fact, commit second degree kidnapping.
122The court then stated that after considering the totality of the record, including the defendant’s criminal record, including now five felony convictions, the appropriate sentence for Hampton was 30 years at hard labor without parole, probation or suspension of sentence.
We consider first Hampton’s complaint that the -sentencing court punished Hampton for the offense for which he was acquitted by the jury, namely, second degree kidnapping.
For purposes of sentencing, a trial judge is not limited to considering only a defendant’s prior convictions. State v. Bright, 39,003 (La.App. 2 Cir. 10/27/04), 886 So.2d 1183. The sources of information relied upon are varied and may include information not normally admissible at trial, such as hearsay, prior arrests without disposition and suspicions of criminal activity without actual proof the defendant committed other offenses. State v. Platt, 43,708 (La.App. 2 Cir. 12/3/08), 998 So.2d 864, writ denied, 2009-0265 (La.11/6/09), 21 So.3d 305; State v. Harris, 39,975 (La.App. 2 Cir. 9/21/05), 911 So.2d 361. “A trial judge may properly consider evidence of other offenses in determination of sentence where there is a showing that the defendant did in fact perpetrate the other offense.” State v. Pierson, 296 So.2d 324 (La.1974), abrogated on other grounds by State v. Sepulvado, 367 So.2d 762 (La.1979).
In United States v. Watts, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), the Supreme Court held that “a jury’s verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a | ^preponderance of the evidence.” Id. at 156-57,117 S.Ct. 633. The Federal Fifth Circuit confirmed that the rule in Watts remains valid law after United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).
In this instance, the court expressly stated that the evidence at trial of Hampton’s conduct related to the charge of second degree kidnaping met the' preponderance of evidence standard. The court made no secret that this was a factor considered in its determination of an appropriate sentence, and, as stated above, it is permissible under our law. We find no error by the trial court in this regard.
We turn now to the question of whether the 30-year sentence is constitutionally excessive. Appellate courts apply a two-pronged test when reviewing a sentence for excessiveness: (1) whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1; and (2) whether the sentence is constitutionally excessive. State v. Gard *562 ner, 46,688 (La.App. 2 Cir. 11/2/11), 77 So.3d 1052.
A sentence can be constitutionally excessive, even when it falls within statutory guidelines if (1) the punishment is so grossly disproportionate to the severity of the crime that, when viewed in light of the harm done to society, it shocks the sense of justice; or, (2) it serves no purpose other than to needlessly inflict pain and suffering. State v. Lobato, 603 So.2d 739 (La.1992). See also, State v. Dorthey, 623 So.2d 1276 (La.1993).
Hampton was found guilty of aggravated flight from an officer, a violation of La. R.S. 14:108.1. This offense carries a maximum sentence ofj^two years at hard labor and a fine up to two thousand dollars. La. R.S. 14:108.1(E)(1).
Subsequently, Hampton was adjudicated an habitual offender under La. R.S. 15:529.1. Under subsection (A)(4) of this statute, a fourth felony offender must be punished as follows:
(4) If the fourth or subsequent felony is such that, upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then:
(a) The person shall be sentenced to imprisonment for the fourth or subsequent felony for a determinate term of not less than the longest prescribed for a first conviction but in no event less than twenty years and not more than his natural life.
Hence, the sentencing range that the court could have sentenced Hampton was 20 years to life imprisonment, with-' out the benefit of probation or suspension of sentence.
After review, we conclude that the record presents an adequate factual basis for Hampton’s 30-year hard labor sentence: (a) Hampton fled from police at a high rate of speed and ignoring stop signs and endangering others; (b) Hampton jumped out of the vehicle and continued to evade police on foot; (c) although he was acquitted of kidnapping, by his own admission, Hampton hid in Amber Robinson’s car, told her he was running from the police, and directed her to drive him away from West Monroe; and (d) Hampton’s criminal history suggests a pattern of criminal activity dating back to 1996, and spanning at least-three states. Considering Hampton’s long criminal history, the 30-year sentence neither shocks our sense of justice, nor is the punishment disproportionate considering the number of past offenses committed. Although sevei'al of the offenses were minor | ^motorist violations, Hampton has demonstrated a continuing, flagrant disregard for law his entire adult life.
In his final assignment, Hampton argues that the trial court erred in imposing a sentence without benefit of parole, probation or suspension of sentence. Hampton requests that this court strike the portion of Hampton’s sentence that prevents him from the potential benefit of parole.
We note that the state, in response, concedes that Hampton would be entitled to parole eligibility as part of his habitual offender status. We also note that the issue raised by this assignment of error also constitutes error patent.
La. R.S. 15:529,1 does not contain a prohibition against parole, but provides that the sentences imposed in conformity with that article be given without benefit of probation or suspension of sentence.
Accordingly, Hampton correctly argues on appeal that the trial court erred when, after adjudicating Hampton a fifth-felony offender, it imposed Hampton’s enhanced sentence to be served without the benefit of parole. La. R.S. 15:529.1(G) does not *563 require that a sentence under the habitual offender statute be served without the benefit of parole.
Although La. R.S. 15:574.4(A)(1) states that “[a] person convicted of a third or subsequent felony offense shall not be eligible for parole,” the Louisiana Supreme Court has consistently held that, when a defendant is sentenced under a statute that contains no prohibition of parole, the district court must sentence the defendant to a term that does not include such a prohibitiombecause parole eligibility under La. R.S. 15:574.4 is to, be Undetermined by the Department of Corrections. St. Amant v.19th Judicial District Court, 94-0567 (La.9/3/96), 678 So.2d 536. Defendant’s parole eligibility as a third or subsequent habitual offender under La. R.S. 15:574.4 is a determination for the. Department of Corrections to make. Defendant’s sentence, therefore, should be amended to delete the denial of parole eligibility.

Other Errors Patent

Our review of the record indicates that the trial court originally sentenced Hampton to' two years at hard labor and ordered him to pay a fine of $2,000. After adjudicating Hampton a fifth felony offender, the trial court sentenced Hampton to 30 years’ imprisonment without the benefit of parole, probation or suspension of sentence; however, the trial court did not vacate Hampton’s original sentence.
An appellate court may correct an illegal sentence at any time. La. C. Cr. P. art, 882. See also, State v. Hampton, 39,158 (La.App. 2 Cir. 1/26/05), 892 So.2d 714; and State v. Hunt, 573 So.2d 585 (La.App. 2 Cir.1991), where this court corrected an error concerning a trial court’s failure to vacate a prior sentence before imposing an enhanced habitual offender sentence. Here, correction of this error does not involve the exercise of the trial court’s sentencing discretion.
For this, reason, we hereby recognize that the 30-year sentence under the habitual offender conviction replaced the prior sentence imposed for aggravated flight from an officer.
^CONCLUSION
For the foregoing reasons, we affirm the defendant’s conviction. We amend the defendant’s 30-year hard, labor sentence to delete the restriction .on parole. As amended, the sentence is affirmed.
CONVICTION AFFIRMED. SENTENCE AMENDED AND AS AMENDED, AFFIRMED.

. A "BOLO” is a police acronym for "be on the lookout”.

. Cummings testified that the vehicle was a Honda Town and Country; however, the photographs in evidence of the vehicle indicate ’it was a Hyundai Tuscan.

.The record refers to the passenger in the vehicle as both "Daniel O’Neil” and "Daniel Owens.” Our review of the record suggests that “O’Neil” and "Owens” refer to the same person.

. The offenses included the following:
• 3/11/1996, Mississippi: possession of Schedule II CDS
• 5/30/1996, Tennessee: larceny of under $500
• 12/6/1998, Mississippi: driving with expired license
• 1/31/2001, Mississippi: various traffic violations, breach of the peace
• 5/31/2001, Mississippi: possession of Schedule II CDS *
• 9/2/2001, Mississippi: various traffic violations, including driving while under the influence
• 9/16/2001, Mississippi: various traffic violations, including reckless driving
• 5/15/2002, Mississippi: various traffic offenses, including driving while under the influence
• 7/14/2003, Mississippi: burglary, escape from jail *
• 6/22/2004, Mississippi: manufacture/sale of Schedule II CDS, possession of marijuana, and evading arrest
• 3/15/2005, Mississippi: contempt of court, manufacture/sale of schedule II substance*
• 3/6/2007, Mississippi: possession of Schedule I CDS while incarcerated *
• 1/23/2014, Louisiana: second degree kidnapping, aggravated flight from officer
• 8/20/2014, Louisiana: public bribery, criminal conspiracy

. The court initially considered these factors in detail while sentencing Hampton for the offense of aggravated flight -from an officer and referred to those considerations while sentencing Hampton pursuant to the habitual offender sentencing proceeding. -