BROWN, CHIEF JUDGE.
| following a jury trial, defendant, Luke Jarrod Hust, was convicted of two counts of attempted first degree murder, in violation of La. R.S. 14:27 and La. R.S. 14:30, and possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1. Hust was subsequently adjudicated a third felony offender as to the possession of a firearm by a convicted felon conviction and a fourth felony offender as to the two attempted first degree murder convictions. Three consecutive life sentences were imposed. Hust has appealed, assigning four errors. Hust’s convictions and sentences are affirmed.
Facts
The testimony at trial established that late in the afternoon of May 21, 2015, Louisiana Department of Wildlife and Fisheries Agents Josh Harris and Scott Bullitt were in the Russell Sage Wildlife Area in Ouachita Parish. Agents Harris and Bullitt observed a Dodge Durango backed up and parked on the levee at the Wham Brake boat launch. Agent Harris testified that as the agents drove toward the truck, the driver of the Durango started his vehicle and drove toward the agents as if he were going to exit the park. Agent Harris explained that all persons who enter the wildlife management area are required to check in at the entry point, and all persons and vehicles in the park are subject to search.
The agents approached the brown truck and, through the open window, spoke to the driver, Toby Trichell. There was a male passenger in the Durango who identified himself as Clay Hust (he was later determined to be defendant, Luke Hust). Trichell and Hust got out of the vehicle to talk to the agents. Agent Bullitt testified that the area |ais known for drug activity; he walked to the levee where the Durango had been parked and found no evidence of illegal activity. Agent Harris conducted a field sobriety test on Trichell, but found no evidence of impairment. The agents explained to Trichell and Hust the park policy requiring that all persons to obtain a *178 registration slip at the entry point into the wildlife management area.
Neither Trichell nor Hust had a valid driver’s license, and the truck’s inspection stickér was expired. Both agents testified that they intended to allow the men to contact someone to come and get them. Agent Bullitt stated that when Trichell could not produce a license, he acted extremely nervous. Trichell consented to a search of the Durango. The agents found small plastic baggies and lithium batteries, but no contraband. Trichell further consented to a search of his person, which revealed no contraband. Agent Bullitt, after observing Trichell, noted no signs of impairment. Agent Bullitt asked Trichell whether he had someone with a driver’s license who could come pick up his vehicle; at that time, Trichell was about to be let go by the agents.
Agent Bullitt then walked to the back of Trichell’s truck, where Agent , Harris and Hust were standing. Agent Bullitt asked Hust whether he was in possession of anything illegal. According to the agent, Hust threw his hands up in the search position and turned to face the truck. Agent Bullitt testified that he conducted a patdown search of Hust and felt a hard metallic object in Hust’s waistband which the agent believed was a pistol magazine. This caused Agent Bullitt some concern because where there is a magazine “it could be a weapon.” Agent Bullitt looked at Agent Harris to. signal that he had found something and began reaching for his handcuffs. Agents Harris Rand Bullitt both testified that when Agent Bullitt reached for the handcuffs, Hust took off running toward a nearby ditch, and they gave chase. While both agents pulled out Tasers, only Agent Harris deployed his Taser, which did not disable Hust. Agent Harris testified that just as Hust jumped the ditch and his feet hit the ground, Hust pulled out a black handgun. Agent Harris threw down his deployed Taser and “broke right” to run around the truck for cover. Agent Harris stated that he noticed two shots ricochet off the ground by his feet as he ran for cover, so he pulled out his gun and réturned fire. Agent Harris testified that the first time he pulled his weapon was after he felt the ricochet shots. Agent Harris reloaded his weapon once he was behind the vehicles, and it was at that time that he saw Trichell in the ditch with Agent Bullitt. Agent Harris testified that Trichell yelled to him, “Hey, your buddy was shot,” and Agent Harris radioed for help. The radio recordings to dispatch and the Ouachita Parish Sheriffs Office were introduced into evidence and played for the jury.
On cross-examination, Agent Harris restated that Hust was “at the ditch” when he pulled out his gun and began firing haphazardly in the direction of the agents. Agent Hams testified, “[Hust] was just on the other side of the ditch and that’s when I realized he had a firearm. ... He was pulling it out and turning over his right shoulder looking back towards the direction of Sgt. Bullitt. ... He fired.”
Toby Trichell’s testimony corroborated that of Agent Harris. Trichell stated that as he was trying to call someone to come pick up him and Hust up, Hust came running around the comer and grabbed at his shirt, which caused Trichell to fall down. It was then that he saw the agents pursuing Hust. Trichell also saw the gun in Hust’s hand before Hust jumped over the |4ditch. Trichell testified that although Hust was running away, he stopped and turned to shoot at the agents. “After [Hust] had went across the ditch is when he turned and started firing rounds.” Trichell explained that he was in the line of fire, so he was “laying low.” After the shooting stopped and Hust ran further into the *179 woods, Triehell saw that Agent Bullitt had spun and fallen in the ditch where he was lying in deep water. Triehell ran to assist Agent Bullitt. Triehell yelled to Agent Harris that his partner had been hit and to call for help. He then reassured Agent Bullitt that he was trying to help, not hurt him, and Triehell held Agent Bullitt’s head above the water in the ditch until first responders arrived.
Agent Bullitt corroborated Agent Harris’s testimony and explained that when Hust started running, Bullitt pulled his Taser out, but when he saw that Hust had a gun, the agent dropped his Taser without deploying it and sought cover in the area of the ditch. Agent Bullitt testified that he recalled that Hust jumped the ditch before turning and firing, but he could not specifically remember Hust’s body position as he fired. Agent Bullitt stated that “I just remember falling in the ditch.” He knew he had been hit and felt numbness begin at his waist and move downward. Triehell came over to him and reassured him that help was on the way. Agent Bullitt underwent several surgeries and is paralyzed from the waist down. Agent Bullitt will be confined to a wheelchair and require ongoing medical treatment for the remainder of his life.
Deputy Mark Palmer testified that he responded to the call for assistance that evening. He arrived to find Triehell holding Agent Bullitt’s head and providing cover for him. Deputy Jared Benjamin testified that he also responded to the call for assistance and located Hust later that night | striding behind a brick column on the porch of his parents’ home. Hust, who was disheveled, coughing and throwing up, had in his possession a .40 caliber handgun. A firearms expert testified that bullet jackets found at the scene were consistent with a .40 caliber bullet.
The jury convicted Hust of two counts of attempted first degree murder and possession of a firearm by a convicted felon. He was subsequently, adjudicated a habitual offender as noted above and was sentenced to three consecutive life sentences. Hust now appeals.
Discussion

Sufficiency of the Evidence

The defense argues that the evidence was insufficient to convict Hust of attempted first degree murder because the state failed to prove that defendant had the specific intent to kill.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, -now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La. 2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2d Cir. 1/14/09), 1 So.3d 833, writ denied, 09-0310 (La. 11/6/09), 21 So.3d 297. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness | Rin whole or in part. State v. Eason, 43,788 (La.App. 2d Cir. 2/25/09), 3 So.3d 685, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
Thé Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evi *180 dence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La. 1983); State v. Speed, 43,786 (La.App. 2d Cir. 1/14/09), 2 So.3d 582, writ denied, 09-0372 (La. 11/6/09), 21 So.3d 299.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App. 2d Cir. 2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App. 2d Cir. 1/27/06), 921 So.2d 219, writ denied, 06-1083 (La. 11/9/06), 941 So.2d 35. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa, 05-0213 (La. 1/19/06), 921 So.2d 94.
La. R.S. 14:30 provides, in pertinent part, that first degree murder is the killing of a human being:
|7(A) (2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman, peace officer, or civilian employee of the Louisiana State Police Crime Laboratory or any other forensic laboratory engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict great bodily harm is directly related to the victim’s status as a fireman, peace officer, or civilian employee.
For the purposes of Paragraph (A)(2) of this Section, the term “peace officer” means any peace officer as defined in La. R.S. 40:2402, which includes, inter alia, a commissioned wildlife enforcement agent.
La. R.S. 14:27 provides, in pertinent part:
(A) Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
The crime of attempted murder, whéther first or second degree, requires proof of the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. State v. Mitchell, 39,305 (La.App. 2d Cir. 2/17/05), 894 So.2d 1240, writ denied, 05-0741 (La. 6/3/05), 903 So.2d 457; State v. Girod, 94-853 (La. App. 5th Cir. 03/15/95), 653 So.2d 664. Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Because specific intent is a state of mind, it does not have to be proven as a fact, but may be inferred from the circumstances and the conduct of the accused. State v. Bishop, 01-2548 (La. 1/14/03), 835 So.2d 434.
Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing it at a person. State v. Reed, 14-1980 (La. 9/7/16), 200 So.3d 291; State v. Williams, 383 So.2d 369 (La. 1980). The fact that multiple shots are fired at a victim indicates a defendant’s [^culpable state of mind and satisfies the specific intent to kill requirement for murder. State v. Griffin, 618 So.2d 680 (La. App. 2d Cir. 1993), writ denied, 625 So.2d 1063 (La. *181 1993). See also State v. Hoffman, 98-3118 (La. 4/11/00), 768 So.2d 542, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000) (in which the court found that a defendant’s act of aiming a lethal weapon and discharging it in the direction of his victims supported a finding by the trier of fact that the defendant acted with the specific intent to kill).
Hust’s argument is that he was running from the agents and firing to deter them from chasing after him and that this does not show that he had the requisite intent to support the two attempted first degree murder convictions. The evidence presented at trial was sufficient for the jury to find that Hust possessed the specific intent to kill. The jury heard the testimony of three witnesses that Hust pulled a handgun while running, jumped the ditch, then turned and began to fire at the two agents before continuing to run into the woods. While Agent Harris testified that Hust was firing haphazardly, the testimony was consistent that, rather than continuing to flee, Hust turned and opened fire on the agents and did not stop shooting once Agent Harris had turned , and started to run away from Hust. Agent Bullitt specifically stated, “As I gave pursuit ... [Hust] jumped the ditch and turned around and he pulled out a pistol and shot me.” Hust’s deliberate and repeated firing at close range at the agents led the jury to reasonably infer that Hust possessed the specific intent to kill.
This assignment is without merit.

^Denial of Challenges for Cause

This case was highly publicized in the news media following the shooting. The majority of potential jurors in the jury pool had at least heard of the incident prior to being called for service. The defense exercised all of its peremptory challenges; thus, at issue on appeal are four challenges for cause made by the defense based upon the jurors’ knowledge of the case, all of which were denied by trial judge. The jurors at issue are Kimberly Fike, Toby Brock, Shane White and Lester Black.
Louisiana Constitution, art. I, § 17(A) guarantees a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. Both the defendant and the state are given 12 peremptory challenges in trials of offenses punishable by death or necessarily by imprisonment at hard labor. La. C. Cr. P. art. 799.
In addition to his constitutionally guaranteed peremptory challenges, a defendant may challenge a juror for cause on several grounds set forth in La. C. Cr. P. art. 797, which include that, inter alia:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict; or
(4) The juror will not accept the law as given to him by the court.
In a challenge for cause, the challenging party has the burden of showing that a prospective juror should be excluded based on one or more of |inthe grounds in La. C. Cr. P. art. 797. State v. White, 535 So.2d 929 (La. App. 2d Cir. 1988), writ denied, 537 So.2d 1161 (La. 1989). In this case, defendant exhausted *182 his peremptory challenges. Reversible error is demonstrated and prejudice is presumed in cases in which a defense challenge for cause was erroneously denied and the defendant ultimately exhausted his peremptory challenges. State v. Coleman, 14-0402 (La. 2/26/16), 188 So.3d 174, cert. denied, — U.S. —, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016); State v. Jones, 03-3542 (La. 10/19/04), 884 So.2d 682. In such a case, a defendant is required to show that the trial court abused its discretion in denying any one of his challenges for cause. State v. Coleman, supra.
A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Id.; State v. Tucker, 13-1631 (La. 9/1/15), 181 So.3d 590, cert. denied, — U.S. —, 136 S.Ct. 1801, 195 L.Ed.2d 774 (2016); State v. Cross, 93-1189 (La. 6/30/95), 658 So.2d 683; State v. Hampton, 50,561 (La.App. 2d Cir. 5/18/16), 195 So.3d 548.
A trial court’s refusal to disqualify a prospective juror is not an abuse of discretion or a reversible error if the perceived bias or impartiality of the prospective juror is properly remedied through rehabilitation. State v. Mickelson, 12-2539 (La. 9/3/14), 149 So.3d 178; State v. Howard, 98-0064 (La. 4/23/99), 751 So.2d 783, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999). Even if a potential juror initially expresses doubt as to the accused’s innocence, he can serve as a competent juror if upon further questioning, he demonstrates an ability to set aside such doubt and follow the law. State v. Cousan, 94-2503 (La. 11/25/96), 684 So.2d 382; State v. Hampton, supra. A prospective juror can be rehabilitated if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. State v. Hampton, supra; State v. Broadway, 440 So.2d 828 (La. App. 2d Cir. 1983).
Kimberly Fike
During questioning, Ms. Fike indicated that she knew about the shooting of a wildlife and fisheries agent generally, but did not know any specific details. She also indicated that her youngest brother is a law enforcement officer in Kentucky. Ms. Fike initially agreed that this fact would tend to make her give more credibility to law enforcement officers than a lay person and “possibly” keep her from being a “fair juror.” Ms. Fike stated that the difficult job that law enforcement officers have might be a factor she would consider in any decision she would make. After further questioning, however, Ms. Fike acknowledged the seriousness of the charges against Hust and advised that “I’m being honest with you. I think I could. I think I could listen to the facts and give you my honest opinion.” Ms. Fike acknowledged that it would be “tough” in light of her brother’s involvement in law enforcement, but adamantly stated, “I still think I could listen to the evidence and make an unbiased decision.”
The defense challenged Ms. Fike on the basis that she has a brother involved in law enforcement, she had knowledge of the case and because she hesitated when initially asked if she could be fair. Defense counsel argued that Ms. Fike vacillated over whether she could be objective and indicated that she would consider an officer’s testimony over the testimony of a lay person. The state responded that Ms. Fike was clear that she. could be fair and impartial and had not yet made up her mind about Hust’s guilt or | ^innocence. The court found that Ms. Fike had been adequately rehabilitated and denied the challenge for cause.
*183 On appeal, Hust argues that it was impossible for Ms. Fike not to be influenced by her ties to law enforcement, despite her good intentions, while the state maintains that Ms. Fike was rehabilitated. The trial judge was within his discretion in finding that Ms. Fike had been rehabilitated. Ms. Fike unequivocally stated that she could give Hust a fair trial and, while acknowledging her connection to law enforcement, she stated several times that she could listen to the evidence and render a fair verdict. See, State v. Noel, 15-617 (La.App. 3d Cir. 12/9/15), 181 So.3d 223; State v. Nelson, 09-807 (La. App. 5th Cir. 03/23/10), 39 So.3d 658.
Toby Brock
Mr. Brock stated that he knew of the shooting from the news, but had not followed the case closely. Mr. Brock’s wife had worked with Agent Bullitt’s wife prior to the shooting, and after the shooting she had texted Mrs. Bullitt to check on her. However, that was before Mrs. Bullitt left her husband and moved out of town, approximately a month after the incident. That was extent of Mr. Brock’s knowledge; he indicated that his wife had not said anything else to him about the shooting. Mr. Brock was aware of fundraisers that had been conducted for Agent Bullitt, but he was not asked to nor did he contribute.
When asked if it would cause problems for his wife at work if he was a juror and voted not guilty, Mr. Brock answered, “No. I wouldn’t think so. Because I’m just one of so many. I [would be] only one of 12 [jurors].” Mr. Brock agreed that he could “absolutely be fair” as a juror and he had no doubt about that.
[ isThe defense challenged Mr. Brock on the basis of his knowledge of the case and his wife’s connection to the former Mrs. Bullitt. The trial judge denied the challenge, noting that the women had only continued to work together for a month after the shooting. The judge pointed out that Mr. Brock stated he could be fair and impartial and had not formed any opinions as to guilt or innocence. There is no indication that the trial judge abused his discretion in concluding that this juror had been rehabilitated. See, State v. Batiste, 15-100 (La.App. 3d Cir. 6/3/15), 165 So.3d 1262.
Shane White
Mr. White advised that he knew of the case from the news, namely that someone had been pulled over for DUI and shots were fired. He also knew that Hust had been apprehended at his parents’ home. Mr. White hunts in the Wham Brake area and was interested in the story. He stated that he watched the live broadcast on the night of the shooting and into the following day because it was “close to home.” Mr. White attended a Whitetails Unliniited Banquet at which donations were being collected for Agent Bullitt. Mr. White saw Agent Bullitt at the banquet, but did not meet him. When asked if his emotions over Agent Bullitt’s injuries and condition would affect his service, Mr. White answered in the negative. Mr. White agreed that the state had the burden to prove Hust’s guilt and that he could be fair and impartial by only considering the evidence at trial and following the law.
The defense argued that Mr. White’s knowledge of and interest in the case, the fact that the story hit “close to home,” his attendance at a banquet that was a fundraiser for the victim and his respect for law enforcement supported a challenge for cause. The trial judge disagreed and, after careful ^^consideration, accepted Mr. White’s unequivocal statements that he could be fair and impartial and require the state to prove the defendant’s guilt, despite the concerns voiced by defense counsel. The trial judge did not abuse his discretion in denying this challenge for cause. See, State v. Roberson, 40,809 (La.App. 2d *184 Cir. 4/19/06), 929 So.2d 789; State v. Jones, 15-0123 (La. App. 4th Cir. 12/02/15), 182 So.3d 251.
Lester Black
Mr. Black also knew of the case from news coverage and had seen a photograph of Hust as the suspect following the shooting. Mr. Black stated that he only knew that “a game warden got shot.” Mr. Black stated that he could be fair and impartial and that he would treat the testimony of law enforcement personnel the same as anyone else’s testimony. Mr. Black indicated that his cousin is a chaplain in the correctional center, and Mr. Black had asked his cousin about' the game warden who had been shot. Mr. Black stated that his cousin told him “that the man—the person that was accused of shooting was locked up. That’s all.” Mr. Black acknowledged that having a picture of the accused in his mind might make his job as a juror hard, but he consistently stated that he could put the picture out of his mind and consider all of the evidence.
The defense challenged Mr. Black based on his recollection of what Hust looked like from a photograph he saw some six months earlier in the news. While the trial judge acknowledged Mr. Black’s limited knowledge of the case, he noted that everyone in the courtroom could see Hust, and Mr. Black gave consistent answers that he could be fair and impartial and has not formed any opinion as to guilt or innocence. The trial judge’s denial of this challenge for cause was not in error. See State v. Roberson, supra; State v. Segura, 13-398 (La.App. 3d Cir. 12/11/13), 127 So.3d 1034, writ denied, 14-0067 (La. 06/20/14), 141 So.3d 286.
This assignment is without merit.

Denial of Motion for Change of Venue

On October 14, 2015, Hust filed a motion for change of venue, asserting that he could not obtain a fair and impartial trial in Ouachita Parish due to the local press coverage, social media, tainting of the jury pool, prejudice in the community at large and billboards and fundraising for Agent Bullitt in the community. Argument and a ruling on the motion were deferred until the jury was chosen. On appeal, Hust urges that the trial court erred in denying his motion for change of venue.
The grounds for a change of venue are set forth in La. C. Cr. P. art. 622, which provides that:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the von- dire examination or the testimony of witnesses at the trial.
A defendant has the burden to establish that he cannot obtain a fair trial in the current parish by showing more than just the public’s general knowledge or familiarity with the facts of the case to be entitled to a change of venue. State v. Magee, 11-0574 (La. 9/28/12), 103 So.3d 285, cert. denied, — U.S. —, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013); State v. Sparks, 88-0017 (La. 5/11/11), 68 So.3d 435; State v. Thompson, 49,483 (La.App. 2d Cir. 3/18/15), 163 So.3d 139. A defendant is not entitled to a | mjury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime; he must show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. *185 State v. Magee, supra; State v. Clark, 02-1463 (La. 6/27/03), 851 So.2d 1055, cert. denied, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004); State v. Cope, 48,739 (La.App. 2d Cir. 4/9/14), 137 So.3d 151, writ denied, 14-1008 (La. 12/8/14), 153 So.3d 440.
In State v. Bell, 315 So.2d 307 (La. 1975), the supreme court enumerated several factors to be considered to determine whether a change of venue is necessary. These factors include: (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and, (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the district court’s sound discretion, which will not be disturbed on appeal in the absence of a showing of error and abuse of discretion. State v. Magee, supra; State v. Cope, supra.
As noted above, the motion for change of venue was argued following jury selection. Defense counsel offered all of the testimony that was elicited from the potential jurors during voir dire and argued that approximately 70% 117of the jury veni-re had prior knowledge of the case from a source such as television, Internet, social media, newspaper and/or requests for donations. However, no additional evidence was introduced in the form of news stories, articles or otherwise. The trial judge recited the factors from State v. Bell, supra, specifically noting that: 1) there was full media coverage, but it was factual only and not over-sensationalized or a “media circus”; 2) most information was released from public officials such as the state police and was factual in nature; 3) while there was pretrial publicity, the time frame was short, there being only six months from arrest to trial; 4) the severity of the offense was great; 5) the area from which the jury is drawn is the entire parish and the news coverage reached the entire area; 6) there were prayer requests and fundraisers on behalf of Agent Bullitt; 7) there was no evidence of community-wide prejudice against the defendant.
In denying the motion, the trial judge expressly stated that, while many of the potential jurors had some general knowledge of the case, there had been no showing of widespread prejudice against Hust as the accused. Likewise, the trial judge noted that there had been an insufficient showing that any of the potential jurors were influenced, as shown in their voir dire testimony, by publicity that had occurred in the case. There has been no showing that the trial judge abused his wide discretion in denying the motion for change of venue.
This assignment of error is without merit.

Habitual Offender Adjudication

In his next assignment of error, Hust argues that his habitual offender adjudication should be vacated because the state failed to prove the nature of the predicate convictions, whether by plea or trial, the circumstances | ^surrounding the convictions and whether Hust was represented by counsel at the time of the predicate convictions.
*186 The state ñled an amended habitual offender bill of information alleging the following predicate convictions:
Simple burglary of an inhabited dwelling, five counts, August 26, 2004, docket number 04F0898, Fourth JDC, Ouachita Parish, sentenced to nine years, first two without suspension, seven suspended with five years’ supervised probation; Aggravated flight, February 11, 2004, docket number 03F1633, Fourth JDC, Ouachita Parish, sentenced to two years at hard labor concurrent with sentence for simple burglary convictions above; Possession of Methamphetamine, October 16, 2Ó07, docket number 06F3214, Fourth JDC, Ouachita Parish, sentence to five years at hard labor.
The bill alleged that Hust should be adjudicated a fourth felony offender on each of the attempted first degree murder convictions and a third felony offender on the possession of- a firearm by a convicted felon conviction. On April 14, 2016, Hust was formally arraigned on the habitual offender bill; he entered a denial and waived delays for filing written objections to the bill. Thus, the hearing proceeded that date, followed by sentencing.
During the hearing, the state introduced the bill of information, the probation judgment and judgment of conviction on the five counts of simple burglary of an inhabited dwelling, and the- bill of information and probation judgment on the aggravated flight conviction. The court took judicial notice of the possession of methamphetamine conviction and the attendant bill of information and judgment' of conviction, as this prior conviction was raised and proven during trial. The only objection raised by the defense was to ensure that the possession of methamphetamine conviction would not be haused as an enhancement to the possession of a firearm conviction as it served as the underlying felony for that charge; hence Hust’s adjudication as a third felony offender on the possession of a firearm by a convicted felon charge.
La. R.S. 15:529.1D(1)(b) provides:
Except as otherwise provided in this Subsection, the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. The presumption of regularity of judgment shall be sufficient to meet the original burden of proof. If the person claims that any conviction alleged is invalid, he shall file a written response to the information. A copy of the response shall be served upon the prosecutor. A person claiming that a conviction alleged in the information was obtained in violation of the constitutions of Louisiana or of the United States shall set forth his claim, and the factual basis therefor, with particularity in his response to the information. The person shall have the burden of proof, by a preponderance of the evidence, on any issue of fact raised by the response. Any challenge to a previous conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.
A defendant has the right to challenge the constitutional- sufficiency of previous convictions through- a written response to the state’s filing of a habitual offender bill of information. La. R.S. 15:529.1(D.)(1). A defendant must make such a response in order to preserve challenges to previous convictions for appeal-able review. Id.; State v. Harris, 44,402 (La.App. 2d Cir. 6/24/09), 20 So.3d 1121, writ denied, 09-2303 (La. 4/23/10), 34 So.3d 271. The procedure set forth in La. R.S. 15:529.1(D)(1) requires the court in which the subsequent conviction , was obtained to bring the offender before the court, inform him of the allegations contained in the information and-of his rights, and require the offender to say whether *187 the allegations are true. If the offender denies the allegation, refuses to answer, or remains silent, his plea or the fact of his silence is entered on the record and he shall be given 15 days to file particular objections to the information. Any | g(1challenge to the previous conviction or adjudication of delinquency not made before sentence is imposed may not thereafter be raised to attack the sentence. State v. Shawn Lewis, 49,542 (La.App. 2d Cir. 1/14/15), 161 So.3d 983; State v. Carlos Lewis, 43,402 (La.App. 2d Cir. 8/13/08), 990 So.2d 109; State v. Ponsell, 33,543 (La.App. 2d Cir. 8/23/00), 766 So.2d 678, writ denied, 00-2726 (La. 10/12/01), 799 So.2d 490.
As noted above, at his adjudication hearing, Hust, after an on-the-record discussion with his attorney and the judge, waived the delay for written objections to the habitual offender bill and made no objections to the introduction of the state’s documentation proving the predicate offenses. Hust failed to comply with La. R.S. 15:529.1(D)(1) and is barred from directly attacking the predicate convictions on appeal.
Conclusion
For the foregoing reasons, defendant’s convictions and sentences are affirmed.