WILLIAMS, J.
The defendant, Calvin Rashad Wooten, was charged by bill of information with armed robbery, in violation of La. R.S. 14:64. Following a jury trial, the defendant was found guilty of the responsive verdict of attempted armed robbery. He was sentenced to serve 15 years in prison at hard labor without the benefit of parole, probation or suspension of sentence. For the following reasons, we affirm.
FACTS
On September 14, 2014, at approximately 2:30 p.m., a young black male entered the home of Tommie Cockerham, an elderly woman, and demanded money. The intruder was wearing a knit cap and his face was covered with a red bandana, exposing only his eyes. During the defendant's trial, Ms. Cockerham testified that she was sitting in her recliner, quilting, when her front door "was jerked open by a young black man," who was brandishing a shotgun and wearing dark clothes, a hat and a bandana. Ms. Cockerham stated:
* * *
He came straight to me, hollering, I want your money. And he got to me and he put the gun right on my forehead, and he kept screaming that at me and I told him I didn't have but four dollars [$4.00], and he was welcome to it. But he didn't accept it. And so he said, what else you got in here? And I said, I don't have anything else. And he said, where's your car keys? And I pointed to my door. I have, just had a nail, had 'em hanging on it. And I pointed to 'em, and he backed over there and got my car keys. Put 'em in his pocket and then he stood by my chair and he put that gun on my chest. And he started to uh, look toward my dining room and my kitchen area and uh, I watched him until I saw him turn his head long enough that he was you know, that I could-I had already seen my phone was right there by me. He hadn't seen it. And I started to dial nine-one-one [9-1-1] and when he heard, heard it, well he came back and that's when he grabbed my right hand and uh, that had the phone in it, and he pulled me out of my recliner chair. It was in recline position. He pulled me up out of it, and I heard the bones in my arm and that's the last of that I remember.
* * *
Ms. Cockerham testified that she lost consciousness after being pulled out of her recliner. She stated that when she awoke, she noticed that her arm was "broke[n] so bad that it was just hanging." She also stated that, after a struggle, she managed *1219 to get up and she eventually reached the telephone to call for help.[1]
When describing the intruder, Ms. Cockerham stated, "All I could see was the barrel of that gun and, and his eyes." During Ms. Cockerham's testimony, the prosecutor held up a red bandana and asked Ms. Cockerham if she recognized it. She replied, "He had a red bandana on his head, on his mouth." The prosecutor asked, "Does this look similar to the bandana wor[n] by the person that broke in[to] your home, and did those horrific acts that you previously described to the jury?" Ms. Cockerham replied, "Yes, sir." However, Ms. Cockerham did not identify the defendant as the intruder during her direct examination.
On cross-examination, Ms. Cockerham testified that she had lived at her residence for at least 17 years and that the defendant and his brother had lived down the street from her since they were "young boys." She stated that she had never had a problem with either of the Wooten brothers. Counsel for the defendant then questioned whether Ms. Cockerham had identified the defendant as the intruder to law enforcement. In response, Ms. Cockerham testified that she believed the defendant was the intruder. The colloquy was as follows:
* * *
Q. Is it true that, that you were unable to identify Calvin Wooten or his brother as the individual that attacked you?
A. I could tell his, by his eyes. He has eyes like his daddy and his grandma.
Q. So, so you're saying now that you know it was Calvin Wooten.
A. I don't, I did not know but it, when I thought of that, those eyes, well that was, that was all I needed.
Q. Do you recall talking to [Detective] Tony Childress after the incident?
A. I remember him being there, yes.
Q. Do you recall the conversation that you had?
A. I don't.
Q. Do you recall telling Detective Childress that you didn't think it was the Wooten Boys?
A. I don't remember, remember telling him that.
Q. Is it possible that you did tell him that?
A. Not that I know of. I did tell my sister I hoped to God it wasn't Calvin's boy.[2]
Q. Do you recall at any time telling Detective Childress that the-your attacker was too short to be one of the [Wooten] boys?
A. I might [have] said that but it's because he was bent over with a gun on me.
Q. And up until today, you, you've never positively identified Calvin Wooten as the suspect, have you?
A. I know it was him.
Q. You know it was him? How do you know it was him?
A. His eyes.
* * *
Defense counsel further questioned Ms. Cockerham with regard to whether she identified the defendant as the intruder to Det. Childress when he visited her home *1220 the second time. The following exchange took place:
* * *
Q. Do you remember talking to [Det.] Childress then?
A. Yes, I do.
Q. Okay, and at that point, during the conversation, you didn't identify Calvin Wooten, did you?
A. I told you what I told you.
Q. Okay, but you never identified him as a suspect.
A. I never identified him but I knew that's who it was.
Q. But you never told Detective Childress that's who you thought it was.
A. Yes, I did.
* * *
Thereafter, Ms. Cockerham admitted that she did not identify the defendant as the intruder from a photographic lineup presented by Det. Childress. She explained that the photographs were "too grainy" to "tell a whole lot about 'em." Defense counsel presented Ms. Cockerham with closeup photographs of the eyes of the persons depicted in the photographic lineup and asked her if she recalled looking at the pictures. She responded that she did not view photographs of only eyes; she saw pictures of "full faces" of the individuals.
Further, Ms. Cockerham testified that she could not conclusively identify the jeans and shirt that had been shown to her by the police officers as the clothing worn by the intruder. She stated that she only knew that the clothing was dark, like the clothing the intruder had worn. She also stated that the police officers had shown her a red bandana that "looked like" the same red bandana worn by the intruder.
Robert Pearson, a Deputy State Fire Marshall, was working as the Assistant Chief of Police for the Town of Columbia on the day of the incident. Deputy Pearson testified as follows: he received a call from dispatch about a possible home invasion or armed robbery by a black male; he proceeded to Ms. Cockerham's house; upon arrival, he met up with Deputy Keith Wilkins, Deputy John Cummings and his K-9, who were canvassing the area looking for suspects matching the description of the intruder; while canvassing the area, he and Deputy Wilkins approached the Wooten home, which was located approximately 200-300 yards from Ms. Cockerham's home; as he approached the home, he saw the defendant, Calvin Rashad Wooten, looking out of a window; shortly thereafter, the defendant and his brother, Denzel Wooten,[3] exited the house and met the deputies on the front porch; he and Deputy Wilkins decided to detain the Wooten brothers because they matched the description of the intruder: "young, black male," and he wanted to detain them until the detective in charge, Tony Childress, arrived to question them; he decided that "safety" required him to secure the Wooten brothers with handcuffs and have them wait in the patrol car; he advised the brothers of their Miranda rights, placed them in handcuffs, patted them down and placed them in the backseat of the patrol car to wait for Det. Childress; approximately three days later, he assisted the Caldwell Parish Sheriff's Office with the execution of a search warrant at the Wooten residence and surrounding property; while searching the property, he found a garbage bag sitting behind a tree next to a pond; the garbage bag "looked out of place"; and he opened the bag to find various items, including a pair of black Levi's jeans, a red bandana, a knit cap and a Crown Royal bag containing .410 shotgun shells.
Det. Tony Childress testified as follows: he went to Ms. Cockerham's home as soon *1221 as he was notified of the home intrusion; when he arrived at the home, he observed that Ms. Cockerham was badly injured, with possibly two broken arms and various cuts and bruises; he stayed with Ms. Cockerham for approximately 15-20 minutes until an ambulance transported her to the hospital; Ms. Cockerham described the incident to him; she informed him that she had lost consciousness and did not know when the intruder had exited her house; Ms. Cockerham told him that the keys to her house and car were missing; the keys were never recovered; while investigating the scene, he observed fresh footprints next to Ms. Cockerham's front door, in the carport near her car and in the dirt road in front of her house; one of the footprints found in the road matched the footprints found by the front door and carport; the footprint did not match the shoes worn by the defendant or his brother on the day of the home intrusion; a second footprint was found in the dirt road but it did not match the footprints found on Ms. Cockerham's property; the second footprint matched the shoes the defendant was wearing that day; it was possible to use the dirt road to get from the Wooten house to Ms. Cockerham's house; it was also possible to get from the Wooten house to the Cockerham house through the wooded area between the homes; it would be difficult to locate footprints in a wooded area; when he arrived at the Wooten house, the Wooten brothers were already in the backseat of the police car; Denzel Wooten told him that his father had just dropped him off at the home when the officers arrived; Denzel told him that when he arrived home, he put his headphones on and jogged down the road, as was his habit; he did not see any footprints from Denzel's shoes in the dirt road; he noticed that the Wooten brothers were not wearing "dark clothing" as described by Ms. Cockerham; when the father of the brothers arrived, he talked to him about the guns in his house; Mr. Wooten told him that he owned a .410 shotgun, but it had been missing for "a couple of days" before the home intrusion;[4] he approached the Wooten brothers while they sat in the back of the patrol car and asked them who took the .410 shotgun from the house; both brothers denied taking the shotgun; he closed the door to the patrol car and continued talking to Mr. Wooten; at the time, he was unaware that one of the police officers had placed a cellphone inside the police vehicle with an activated recorder; and he later listened to the recording and heard a conversation that had taken place between the defendant and his brother.
At this point during Det. Childress' testimony, defense counsel objected to the detective's identification of the voices on the recording, citing lack of foundation and hearsay. Defense counsel then stated, "[T]he tape can be played and the jury can determine what it says on its own ... I object to this testifying to what he thinks is on the tape when the jury can listen to it themselves." The trial court did not address the "hearsay" objection. Rather, the court directed the state to "lay a foundation." Thereafter, Det. Childress testified that he was able to differentiate the brothers' voices because he had spoken to them prior to listening to the recording.
Defense counsel entered another objection, arguing that the identification of a person's voice required an expert and Det. Childress was not a voice recognition expert. The trial court overruled the objection, finding that it is "fairly common" for a lay individual to recognize a person's voice. In response, defense counsel argued that Det. Childress did not speak with the Wooten brothers long enough to be able to *1222 differentiate their voices. The trial court maintained its ruling.
Det. Childress' testimony continued as follows: on the recording, he heard Denzel say something akin to "you shouldn't of went [sic] down there and done that man"; he did not hear a response from the defendant; the Wooten brothers voluntarily went to the police station for questioning; he questioned them about the statement Denzel made on the recording; Denzel stated that he assumed the defendant had committed the crime based on what he heard about the incident; several days after the incident, he and several other deputies returned with a warrant to search the Wooten home; during a search of the area near a pond, he and the deputies found a garbage bag; the items found in the garbage bag were as follows: trash, mail addressed to the Wooten home, an undamaged pair of dark Levi's jeans, a Crown Royal bag located in the back pocket of the jeans, three .410 shells located inside the Crown Royal bag, a red bandana with a knot tied in it and "folded in a way someone would wear it over their face," a cap and a blue long-sleeved pullover shirt;[5] the pond where the garbage bag was found is located near an "older" road that was no longer used by members of the public; the few houses in the area of the Wooten home were not close together; after the deputies found the garbage bag, he met with Ms. Cockerham and asked her if she could identify any of the clothing found in the garbage bag; the only item Ms. Cockerham recognized was the red bandana; it appeared as if "she was scared all over when I showed it to her .... She said that's it. That's what he was wearing"; he presented Ms. Cockerham with a photographic lineup that consisted of only the eyes of multiple young black men, one of which was the defendant; Ms. Cockerham was unable to identify any of the eyes as being those of the defendant; he obtained a search warrant for the defendant's DNA and a sample was sent to the crime lab to be compared with DNA found on the red bandana; the first crime lab report indicated that no DNA was found on the bandana; and he discussed the matter with several other deputies and decided to ask the crime lab to swab the area of the bandana where the knot had been tied.
At this point in the proceedings, the state introduced into evidence the recording of the Wooten brothers' conversation as they sat in the back of the police car. The state sought to play parts of the recording for the jury. In response, defense counsel objected to the jury hearing only parts of the recording. Defense counsel argued that the entire recording should be played in the presence of the jury. The trial court agreed and ordered the state to play the entire recording. However, due to technical difficulties, the trial court ordered that only excerpts be played for the jury, through ear phones, in which the jury would have to listen to the recording one at a time. Thereafter, the recording was admitted into evidence without objection.
On cross-examination, Det. Childress testified as follows: when he first spoke with Ms. Cockerham, she described the intruder as a black male, approximately 5'9" tall; she stated that she did not believe the intruder could have been one of the Wooten brothers because of the intruder's height; when he spoke to Ms. Cockerham, he did not know the Wooten brothers; Ms. Cockerham was the one who first brought up the Wooten name; Ms. Cockerham told him that she was only able to see the *1223 intruder's eyes because his face was covered with a bandana and a cap was pulled down to his eyebrows; Ms. Cockerham identified the intruder's gun as a shotgun; Ms. Cockerham stated that she did not know enough about guns to tell him "anything about it"; the Wooten brothers voluntarily went to the sheriff's office for questioning and were transported in separate police cars; after the Wooten brothers were transported away from the scene, one of the deputies told him that a recording had been made of a conversation between the brothers as they sat in the back of a patrol car; he listened to the recording and concluded that the defendant was the intruder; he advised the Wooten brothers of their Miranda rights after they arrived at the sheriff's office; the brothers signed the "rights forms" but refused to provide a statement; Denzel discussed the comments he made on the recording; and he placed the defendant under arrest.
When asked to clarify why he arrested the defendant, Det. Childress testified that the defendant fit the victim's description, i.e. "black male," he had listened to the comment Denzel made to the defendant as they sat inside the police car, and he noticed that the defendant did not deny or defend Denzel's comment. Defense counsel then asked the detective if he heard the defendant respond to Denzel's comment by stating, "I didn't do sh*t." Det. Childress agreed that he heard the defendant make a similar statement on the recording. However, the detective maintained that the defendant's statement was not "an immediate response" to his brother's accusation.
Defense counsel also questioned Det. Childress with regard to Ms. Cockerham's testimony that the photographic lineup he showed her was of complete faces, rather than just the participants' eyes. The detective testified that he only showed Ms. Cockerham photographs of eyes and that she was "mistaken" in her recollection of the lineup. He also stated that during his second interview with Ms. Cockerham, she was able to recall some additional details about her assailant: he was wearing a dark-colored blue or gray knit cap, a faded red bandana across his nose with his eyes exposed, and a long-sleeved button-up shirt with blue jeans. She also recalled that the assailant touched her forehead and chest with the shotgun. Det. Childress further testified that Ms. Cockherham did not tell him that the assailant was wielding a .410 shotgun.
Det. Childress further testified under cross-examination as follows: during Ms. Cockerham's third interview, he showed her the clothing that was found in the garbage bag on the Wooten property; he did not obtain fingerprints from the garbage bag or from the items that were recovered in the bag, including the shotgun shells; "someone," possibly the defendant's father or another neighbor, reported that they had seen an unidentified black male in the area on the day of the intrusion; he did not verify the information regarding an unidentified black man; and he did not consider any suspect other than the defendant because he "had no reason to look anywhere else."
Denzel Wooten testified as follows: he did not recall telling the defendant, "I can't believe you went down there and did that stuff"; he did not recall telling Det. Childress that he "assumed" the defendant had committed the offense; and he did not have any knowledge of the trash bag found on his father's property.
The defendant's father, Calvin Wooten, testified as follows: on the day of the incident, at approximately 2:00 p.m., he picked Denzel up from Columbia, dropped him off at their home and left again; subsequently, Det. Childress called him and told him to come home; when he arrived at his home, Det. Childress informed him that a black *1224 male had broken into Ms. Cockerham's house armed with a shotgun and may have broken both of her arms; the detective also told him that his sons were being detained because they were the only black males in the area; when he arrived, he found his sons sitting in the backseat of the police car; he walked Det. Childress through the house and showed him the guns that he kept there; he told Det. Childress that all of his guns were accounted for, except for a .410 shotgun that had been missing for approximately two or three months; he informed Det. Childress that he and another neighbor had seen an unidentified black male in the area approximately one week prior to the incident; on the night of the home intrusion, Det. Childress and Det. Sedric Meredith returned to his house and he consented to a search of his property; the officers searched his house and the surrounding property, including the pond area, for approximately 1½ hours; the following morning, the officers returned to his property, without his permission, and searched the wooded area between his house and Ms. Cockerham's house; a few days later, the officers returned with a search warrant and searched the property again; he noticed divers searching the pond located on his property; he does not have trash pickup at his house, so he burns his trash in his backyard; the garbage bag containing the items found on his property were not located in the same place where he usually burns his trash; and he did not know how the garbage bag with the clothing came to be on his property.
Sedric Meredith, the chief of police for the Town of Columbia,[6] testified as follows: he accompanied Det. Childress to the Wooten house late in the evening on the date of the incident; Calvin Wooten granted them permission to search the house; neither he nor Det. Childress searched the area near the pond that night; and the search lasted for approximately 45 minutes.
Det. Childress was recalled as a witness for the state. After being reminded of his previous testimony that he had searched the Wooten property only one time,[7] Det. Childress testified that he did not recall searching the property any time except for the time he executed the search warrant.
Katie Traweek, a forensic DNA analyst for the North Louisiana Crime Lab, testified as follows: she performed DNA tests on the red bandana and shirt that were found in the garbage bag on the Wooten property; she performed the tests by cutting small pieces from the bandana and the shirt; there was insufficient DNA on the cuttings to provide a valid DNA profile; subsequently, at the request of Det. Childress, she performed an "alternative" DNA collection procedure on the clothing; during this round of testing, she untied the knot on the bandana and swabbed the areas of the knot to obtain DNA samples; she was able to create a DNA profile; the DNA profile obtained from the knot on the bandana was consistent with the reference sample obtained from the defendant; only .2% of the earth's population may have DNA consistent with the DNA profile obtained from the bandana swab; the DNA profile obtained from the shirt was a mixture of at least two people; and the mixed sample prevented her from determining whether she could include or exclude the defendant as a donor.
On cross-examination, Traweek testified as follows: it was possible (but not probable)
*1225 that DNA from other items found in the garbage bag with the bandana could have been transferred to the bandana; the above cited statistics regarding the likelihood of a DNA match to someone other than the defendant applied only to nonrelated individuals; the statistics from related persons were "slightly" different; she could not identify the exact probability without a reference sample from the defendant's relatives; the DNA profile obtained from the bandana could not have come from a relative of the defendant because the relative's DNA profile would be different from the defendant's DNA profile; there could have been DNA from other persons on the areas of clothing that she did not test; she could not specifically exclude any particular person as a DNA contributor without obtaining a reference sample of their DNA; only one DNA sample was found in the swabs from the bandana and it matched the defendant's DNA; and the chances that she could find another DNA match to that sample was 1 in 7.27 billion.
At the conclusion of the trial, the jury found the defendant guilty of attempted armed robbery. The trial court sentenced him to 15 years' imprisonment at hard labor, without the benefit of parole, probation or suspension of sentence. Subsequently, the court denied the defendant's motion to reconsider sentence.
The defendant appeals.
DISCUSSION
The defendant contends the evidence adduced at trial was insufficient to support his conviction for attempted armed robbery. He argues that the evidence shows that his arrest and conviction are the result of the authorities' "rush to judgment" and the belief that he is guilty because he is a young black male who happened to live down the street from the victim. He also argues that the suspect wore a bandana that covered most of his face during the commission of the crime; therefore, the state had the burden of excluding every reasonable hypothesis of his innocence. Further, the defendant maintains that the evidence established that the perpetrator of the crime could have just as easily been his brother, Denzel Wooten.
Additionally, the defendant contends Ms. Cockerham's trial testimony was unreliable. He asserts that Ms. Cockerham testified that she recognized the defendant as her attacker by his eyes and that the shotgun used in the robbery was a .410 shotgun. The evidence established that immediately after the crime, Ms. Cockerham told Det. Childress that the offender was not one of the Wooten brothers and she did not identify the defendant as the offender in the photographic lineup. Furthermore, according to Det. Childress, Ms. Cockerham told him that she did not know enough about guns to identify the type of shotgun used in the robbery. The detective admitted that prior to trial, he told Ms. Cockerham that a .410 shotgun was missing from the Wooten house.
Further, the defendant contends the evidence submitted by the state did not exclude his brother as a suspect. He argues that the state did not prove that the accusation on the recording came from Denzel, rather than from him. According to the defendant, Det. Childress was not competent to accurately differentiate between his voice and that of Denzel on the recording, as he had little prior contact with the Wooten brothers. Furthermore, the trial court should have required identification of the brothers' voices by an expert or a voice identification program.
Moreover, the defendant contends the garbage bag and the items in the bag were not clearly linked to him, rather than to his brother or a third party. He argues that the police officers failed to determine *1226 whether the clothes found in the bag were the size he wore. Further, they never obtained fingerprints from the garbage bag or from the items found inside the bag.
The defendant also argues that the DNA evidence did not clearly link him to the crime and did not clearly exclude his brother. He maintains that Traweek testified that the bandana could have had someone else's DNA in the areas she did not test. Traweek also testified that the shirt in the bag had a mixture of DNA from two sources and that she could not conclusively exclude Denzel as a DNA contributor to the clothing found in the garbage bag because she was never provided with a sample of Denzel's DNA.
Finally, the defendant argues that there was a multitude of evidence showing that he was not the offender. He maintains that he was not wearing jeans or dark clothing when he was detained shortly after the robbery, the fresh footprints found near Ms. Cockerham's front door and on her carport did not match the shoes he was wearing that day, his father's .410 shotgun had been missing for months prior to the robbery and the police officers never investigated reports of an unidentified black male in the area a week before the assault on Ms. Cockerham.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So.2d 921, cert denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed. 2d 248 (2004) ; State v. Breedlove , 51,055 (La. App. 2 Cir. 1/11/17), 213 So.3d 1195, writ denied , 2017-0270 (La. 11/6/17), 229 So.3d 468 ; State v. Crossley , 48,149 (La. App. 2 Cir. 6/26/13), 117 So.3d 585, writ denied , 2013-1798 (La. 2/14/14), 132 So.3d 410. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 2005-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Breedlove , supra ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied , 2009-0310 (La. 11/6/09), 21 So.3d 297. An appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Kelly , 2005-0484 (La. 6/29/16), 195 So.3d 449 ; State v. Taylor , 47,400 (La. App. 2 Cir. 7/18/12), 103 So.3d 405 ; State v. Eason , 43,788 (La. App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied , 2009-0725 (La. 12/11/09), 23 So.3d 913, cert. denied , 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. State v. Lilly , 468 So.2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Lilly , supra ; State v. Robinson , 47,437 (La. App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied , 2012-2658 (La. 5/17/13), 117 So.3d 918. A reasonable alternative hypothesis is not one "which could explain the events in an exculpatory fashion," but one that "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.' " State v. Captville , 448 So.2d 676 (La. 1984).
*1227 The trier of fact is charged with weighing the credibility of this evidence and on review, the same standard as in Jackson v. Virginia , supra , is applied, giving great deference to the fact finder's conclusions. State v. Hill , 47,568 (La. App. 2 Cir. 9/26/12), 106 So.3d 617. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover , 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied , 2012-2667 (La. 5/24/13), 116 So.3d 659.
In cases involving a defendant's claim that he was not the person who committed the crime, or remains silent, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hughes , 2005-0992 (La. 11/29/06), 943 So.2d 1047 ; State v. Powell , 27,959 (La. App. 2 Cir. 4/12/96), 677 So.2d 1008, writ denied , 1996-1807 (La. 2/21/97), 688 So.2d 520. A witness's failure to identify the suspect at a pretrial lineup is not grounds to bar the in-court identification; rather, it affects the weight of the testimony. State v. Long , 408 So.2d 1221 (La. 1982) ; State v. Richie , 44,783 (La. App. 2 Cir. 10/28/09), 25 So.3d 879 ; State v. Wilson , 27,228 (La. App. 2 Cir. 8/23/95), 660 So.2d 571. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness-if believed by the trier of fact-is sufficient to support the requisite factual conclusion. State v. Jefferson , 47,009 (La. App. 2 Cir. 3/7/12), 91 So.3d 1007, writ denied , 2012-0751 (La. 11/2/12), 99 So.3d 661 ; State v. Jones , 34,863 (La. App. 2 Cir. 8/22/01), 794 So.2d 107. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey , 2009-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64. To convict a defendant of attempted armed robbery, the state must prove that the defendant, having the specific intent to commit armed robbery, did or omitted an act for the purpose of and tending directly toward the taking of anything of value belonging to another, from the person of another or in the immediate control of another, by the use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:27 and 64; State v. Frazier , 37,010 (La. App. 2 Cir. 4/9/03), 843 So.2d 562, writ denied , 2003-1333 (La. 11/21/03), 860 So.2d 542 ; State v. Musgrove , 33,977 (La. App. 2 Cir. 12/15/00), 774 So.2d 1155.
In the instant case, as the defendant pointed out, Ms. Cockerham did not initially pick him out of a photographic lineup and she disputes that she told Det. Childress that her attacker was not one of the Wooten brothers. However, that evidence affected the weight of her testimony, which is in the province of the jury. During her testimony at trial, Ms. Cockerham provided the jury with reasonable explanations for the discrepancies in her testimony. For example, she explained that the photographs presented to her were "grainy," which caused her to have a difficult time seeing the suspects' eyes. The jury was provided with the copy of the photographs that Ms. Cockerham reviewed and members of the jury were able to make their own determinations regarding the veracity of her statement. Additionally, *1228 Ms. Cockerham testified that she could not recall telling Det. Childress that the intruder could not have been one of the Wooten brothers. In fact, she testified that she knew the defendant was her attacker because she recognized his eyes, which, according to her, were similar to those of his father and grandmother, with whom she was familiar. Further, Ms. Cockerham explained the height difference between her attacker and the defendant by stating that the attacker "was bent over with a gun on me." We also note that Det. Childress stated that he did not know the Wooten brothers, and the victim was the first one to mention the Wooten name on the night of the incident. The jury's verdict reflects that it found Ms. Cockerham's testimony to be credible.
Additionally, the state presented physical evidence linking the defendant to the crime. The red bandana, matching the description of the one worn by the intruder, was found in a garbage bag[8] on the Wooten property, along with clothing that was similar to that worn by the intruder. Ms. Cockerham was unable to conclusively identify the clothing found in the garbage bag as that worn by the intruder. However, Det. Childress testified that, in her statement to him, Ms. Cockerham unequivocally recognized the red bandana found in the garbage bag as the bandana worn by the intruder. The state also submitted DNA evidence that was obtained from the knot of the red bandana that was consistent with the defendant's DNA profile. The jury heard the defendant's arguments challenging the DNA evidence. Nevertheless, the jury's verdict indicates that it accepted the expert witness's testimony regarding the DNA evidence.
Moreover, the state introduced the voice recording into evidence. La. C.E. art. 701 permits a lay witness to advance opinions which are rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.[9] The trial court is vested with broad discretion in administering Article 701. La. C.E. art. 701, comment (b); Shaw v. Fidelity & Cas. Ins. , 582 So.2d 919 (La. App. 2 Cir. 1991).
In State v. Jefferson , 2004-1960 (La. App. 4 Cir. 12/21/05), 922 So.2d 577, writ denied , 2006-0940 (La. 10/27/06), 939 So.2d 1276, the defendant objected to a detective's identification of the voice of an eyewitness on a 9-1-1 recording. The detective testified that he recognized the witness's voice based on the time he spent with the witness during his interview and investigation of the case. The court of appeal found that the requirements of La. C.E. art. 701 were satisfied because the detective's opinion regarding the identification of the voice was rationally based on his perception and was helpful to a determination of a fact in issue regarding the phone call.
In this case, Det. Childress testified that he was able to differentiate between the voices of the Wooten brothers because he had talked to them shortly before he listened to the audio recording. Det. Childress stated that, on the recording, he heard Denzel say, "You shouldn't have done that sh*t man." According to Det. Childress, Denzel later confirmed that he *1229 made the statement on the recording and explained that he did so because he thought his brother (the defendant) committed the crime.
Furthermore, the jury listened to the audio recording and had the benefit of hearing Denzel speak during the trial. The voices of Denzel and the defendant are easily discernible on the recording. Denzel can be identified by his statements, which are consistent with what he told Det. Childress: he "just got here" and "You shouldn't have done that sh*t man." Approximately one minute later, the defendant could be heard saying, "dumb ass nig*a going to tell them the fu*king gun is missing." After a short inaudible interval in the recording, the defendant is heard saying, "Nobody done sh*t."
It is apparent from the jury verdict that the jury found the testimony of Ms. Cockerham and Det. Childress to be credible. In addition, as stated above, the jury was able to listen to the audio recording of the conversation between the defendant and his brother. Considering the evidence in a light most favorable to the prosecution, we find that the jury had sufficient evidence to conclude, beyond a reasonable doubt, that the defendant was the perpetrator, and was therefore guilty of attempted armed robbery. This assignment is without merit.
Jury Selection
The defendant also contends the trial court erred in denying his challenges for cause with respect to three prospective jurors. More specifically, he argues that during voir dire , Marvin Bailey[10] stated that his mother-in-law was the victim of a violent crime; Delores Gough stated that the defendant "must be in court for a reason"; and Sylvia Quaid stated that she was the victim of an armed robbery and assault approximately 25 years ago. According to the defendant, these three prospective jurors did not have the ability to be impartial or accept the law as given to them.
La. Const. art. I, § 17 (A) guarantees a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. In trials of offenses punishable by death or necessarily by imprisonment at hard labor, both the defendant and the state are given 12 peremptory challenges. La. C. Cr. P. art. 799. In addition to his constitutionally guaranteed peremptory challenges, a defendant may challenge a juror for cause. La. C. Cr. P. art. 797 provides, in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
* * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
* * *
(4) The juror will not accept the law as given to him by the court[.]
* * *
In a challenge for cause, the challenging party has the burden of showing that a prospective juror should be excluded based on one or more of the grounds set forth in La. C. Cr. P. art. 797. State v. Hust , 51,015 (La. App. 2 Cir. 1/11/17), 214 So.3d 174, writ denied , *1230 2017-0352 (La. 11/17/17), 229 So.3d 928, citing State v. White , 535 So.2d 929 (La. App. 2 Cir. 1988), writ denied , 537 So.2d 1161 (La. 1989). Reversible error is demonstrated and prejudice is presumed in cases in which a defense challenge for cause was erroneously denied and the defendant ultimately exhausted his peremptory challenges. State v. Coleman , 2014-0402 (La. 2/26/16), 188 So.3d 174, cert. denied , --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016) ; State v. Jones , 2003-3542 (La. 10/19/04), 884 So.2d 582. In such a case, the defendant is required to show that the trial court abused its discretion in denying any one of his challenges for cause. State v. Coleman , supra .
A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Tucker , 2013-1631 (La. 9/1/15), 181 So.3d 590, cert. denied , --- U.S. ----, 136 S.Ct. 1801, 195 L.Ed. 2d 774 (2016) ; State v. Hust , supra ; State v. Hampton , 50,561 (La. App. 2 Cir. 5/18/16), 195 So.3d 548, writ denied , 2016-1181 (La. 5/26/17), 221 So.3d 854. A trial court's refusal to disqualify a prospective juror is not an abuse of discretion or a reversible error if the perceived bias or impartiality of the prospective juror is properly remedied through rehabilitation. State v. Hust , supra ; State v. Mickelson , 2012-2539 (La. 9/3/14), 149 So.3d 178 ; State v. Howard , 1998-0064 (La. 4/23/99), 751 So.2d 783, cert. denied , 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed. 2d 328 (1999). A prospective juror can be rehabilitated if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. State v. Hust , supra ; State v. Hampton , supra .
In the instant case, during voir dire , the colloquy with regard to Ray Bailey was as follows:
[The State]: * * * And what we ask is that we find out from you all whether or not you're that type of person that you can follow the law. Because if you can't, we just wanna [sic] know. * * * [W]e just need to know the truth. Now, can you follow the law as the judge instructs you?
Mr. Ray Bailey: Yes sir.
[The State]: Are you that type of person?
Mr. Ray Bailey: Yes sir.
* * *
[Defense Counsel]: * * * Does anybody here have a close friend or a family member that was a victim of a crime?
* * *
Mr. Ray Bailey: Yeah, my mother-in-law was the victim of trying to [sic] break and enter. * * * [A]nd she was put in the hospital and had to have a pacemaker in her [sic].
* * *
[Defense Counsel]: [T]he State's accused my client of, of breaking into a house as well. The fact that your mother-in-law was the victim of a similar crime, do you feel that would be something that would weigh on you if you were asked to make a decision in this case?
Mr. Ray Bailey: Yes, I do.
[Defense Counsel]: Okay. Do you think it's something that you would think about in making a decision?
Mr. Ray Bailey: [No response recorded-indicates affirmatively].
[Defense Counsel]: Okay. Can you explain to me, if you can, exactly how it would affect you?
Mr. Ray Bailey: Well, it's, it's just like going through it all again, you know. She like to died [sic] on account of that.
* * *
*1231 Thereafter, the defense challenged Ray Bailey for cause, and the following exchange took place:
[Defense Counsel]: Your, Honor, I would like to challenge Mr. Bailey for cause. Uh, he specifically stated that he was, uh, his mother-in-law was a victim of a crime. I asked him if it would weigh on him. He said it would weigh, it would weigh on him in this case. He'd have a problem making a decision. Aside from anything he said, he also looked like he was really having a hard time hearing us. He was very disinterested. We had to repeat things to him numerous times. So, I worried physically, and maybe I should've touched on that more. But for the main reason that he said his mother-in-law was a victim. I asked him if that would affect his decision-making process. He said it would, and that it would weigh on him during this case. And for those reasons, Your Honor, I would challenge Mr. Bailey for cause.
[The State]: In response, uh, even in light of those questions, the last thing I have, I asked could he follow the law. He answered in the affirmative. And I think that is what we're here to seek, if whether he would be impartial. And by virtue of the statement he would follow the law. I don't believe a [challenge for] cause is appropriate.
THE COURT: His answer was that it would weigh on him. He didn't say he couldn't do it or it would make-but he did say it would weigh on him. It caused me some concern, but I don't think it rises to the level of cause. So that [challenge for] cause is Denied.
Thereafter, the following exchange occurred with regard to prospective juror Delores Gough:
[The State]: [C]an you follow the law?
Ms. Gough: Yes.
[The State]: Okay, and there's nothing in your backgr-in your personal life, I may say, that would cause you to-
Ms. Gough: No sir.
[The State]: -convicting [sic] somebody, if guilty, I say, vote guilty if we prove it beyond a reasonable doubt?
Ms. Gough: If you prove it, I believe it.
* * *
[Defense Counsel]: Does anybody here feel like, because of the nature of the crime, that [the defendant is] automatically guilty? Or, or thinking that because he's sitting here that he's gotta [sic] be guilty? Anybody think that?
* * *
Ms. Gough: * * * I believe he wouldn't be sitting there if he didn't do something, or the law wouldn't have arrested him.
* * *
[Defense Counsel]: He's done something or he wouldn't be there?
Ms. Gough: Yes.
[Defense Counsel]: Okay. And when we start the trial, would [the defendant] kinda [sic] be, I guess a little behind in the race versus the State?
Ms. Gough: I don't think so, he has a chance to prove he's not guilty.
* * *
[Defense Counsel]: If you were picked for the jury and right now the Judge said, * * * I want you to make a decision, is [the defendant] innocent or guilty. What decision would you make right now?
* * *
Ms. Gough: I'm a stranger here-don't know the first soul in this place.
[Defense Counsel]: Uh huh [affirmative].
Ms. Gough: I can't say he's guilty or he's not guilty if I don't know.
* * *
*1232 [Defense Counsel]: * * * Ms. Delores, what would you, I said define reasonable doubt for me, beyond reasonable doubt, what would you say?
Ms. Gough: That would seem to me as if there was enough evidence, y'all produced enough evidence to prove that he was guilty.
* * *
[The State]: * * * Do you believe, that he did something by the mere fact that he's sitting here? And I think you answered in the affirmative. * * * The fact that he is sitting here, and the fact that you believe that [he] may have done something that caused him to be sitting here, would that give you an opinion, a preconceived notion of his innocence or guilt?[11]
* * *
[Defense Counsel]: We want [12] people who are gonna [sic] be impartial and be fair, and that's why we're here, why we're asking these questions. Ms. Gough, I'm going to as the same to you.
Ms. Gough: I feel the same way, but I also know that there's a chance that he may be not guilty, too, so you know. I wasn't there, I can't say anything, I have to listen to you all's evidence.
* * *
[Defense Counsel]: Your Honor, we do, we could challenge Ms. Gough for cause. Uh, when I first questioned her, [s]he said, well, he's sitting here because he must've done something. She again, * * * said but, I could listen to the evidence and he could prove that he's innocent. But she kept going back to, uh, he's here for some reason. Uh, she was, they tried to rehabilitate her. And you know, they asked her, can you follow the law, and I don't know of a single juror ever that said no, I can't follow the law.
* * *
[Defense Counsel]: I think we have to look further than just the answer to that question. When, when she was questioned by [the state], and myself, uh, as lawyers often style the same question in numerous ways, she kept saying he's here for some reason. She kept saying that she could follow the law, but she also kept harping that he could prove that he's innocent. I think that puts her in a position of being an unfair juror. I don't know if she failed to grasp the concepts or just refused to, but she was pretty clear.
[The State]: You know, the notes that I have, Your Honor, uh, when asked directly, do you think the Defendant is behind in the race? That's the exact words. And she said, no. Uh, and I think that speaks volumes to her ability to be an impartial juror.
[Defense Counsel]: Your Honor, she did say that, but she followed it up with, I think he could prove that he's innocent.
*1233 THE COURT: The problem I have with the argument is that she sort of answered everybody's questions and, and but I don't know that she ever really crossed that line. She certainly, your other causes are a lot stronger I think than her. Uh, I just don't think she rises to the cause. I'm gonna [sic] deny that.
Further, with regard to juror Sylvia Quaid, the colloquy was as follows:
[The State]: [Do] you have a relative that's been the victim of a crime?
Ms. Quaid: I was. * * * It was armed robbery, and I was assaulted.
* * *
[The State]: [H]ow long ago was that?
Ms. Quaid: Twenty-five [25] years ago[.]
[The State]: Twenty-five [25] years? Have you uh, have you relived that over the last Twenty-five [25] years?
Ms. Quaid: Yes.
[The State]: Can you tell us whether or not it's still a constant recurring issue with you?
Ms. Quaid: No.
[The State]: * * *[T]he fact that it occurred to you twenty-five [25] years ago * * * do you feel like you could listen to the evidence in this case and restrain yourself to the evidence in this case without the subjective thoughts of what occurred back then?
Ms. Quaid: Yes.
[The State]: And not use them, just be objective as to what occurs here?
Ms. Quaid: Yes.
[The State]: And you wouldn't feel uncomfortable about sitting on this jury?
Ms. Quaid: No.
* * *
[Defense Counsel]: The Judge is gonna tell you, the law says [the defendant] is presumed innocent til proven guilty beyond a reasonable doubt. And he's gonna ask you to presume that he's innocent. That means he's got a clean slate. And that means that until you're handed this case to make a decision, until you make that decision, he's an innocent man. * * * And most of you say well, I could follow the law. * * * The law says presumption of innocence, but we have opinions. And some of our opinions are, well, he got arrested and he's sitting over here, and he's facing a jury trial, he must've done something wrong. Has anybody felt that way, or had that thought? * * * Ms. Quaid, have you?
Ms. Quaid: Yes.
[Defense Counsel]: * * * So, you do feel like he's been arrested, he's sitting in front of a jury trial-
[Sylvia] Quaid]: He's been arrested, so that would be my biggest [inaudible].
[Defense Counsel]: And although we tell you that, oh, he's presumed to be innocent, you'd still have to contend with that issue, correct?
Ms. Quaid: Innocent until proven guilty, but he's been arrested.
* * *
Subsequently, the defendant challenged Ms. Quaid for cause, stating:
Uh, she said she was the victim of an armed robbery, and she said that she could clear her mind of it. Her demeanor said something else. She almost, I almost, I thought she was gonna get upset for a minute. But towards the end, when I started asking about presumption of innocence, I asked her a couple of times and she said, but, he's been arrested. Uh, she seemed to be adamant that that would be hard for her to get past. We said, you, know, he's got a presumption, presumption, she said, yeah, I think I can apply the law, but he's been arrested. And we think, Your Honor, that's enough of a challenge for Cause. It shows that she's inclined not to give him a presumption of innocence, and in fact *1234 it shows that uh, she's inclined to hold him being arrested against him.
The State acknowledged that Ms. Quaid stated that she had been the victim of an armed robbery/assault. However, the State countered that "she went on to say that she could be objective." Further, the State maintained that Ms. Quaid "went on to say that she understands that he's innocent until proven guilty. * * * [S]he was able to rehabilitate herself and show that she would be impartial."
The trial court denied the defendant's challenge for cause regarding Ms. Quaid, stating:
I heard her say the issue about [the defendant] being arrested, but then I heard her say she could give him the presumption of innocence. And she said repeatedly, uh, uh, that she could follow the law. And as for the comments as to her demeanor, that's not the impression I got at all, I was watching her demeanor, I did not catch that.
After reviewing the voir dire record as a whole, we find that the trial court did not abuse its broad discretion in denying the defendant's challenges for cause with regard to Bailey, Gough and Quaid. In response to the questions posed by the state and defense counsel, the jurors indicated that they were willing to be fair and impartial and that they could follow the law. It is undisputed that both Gough and Quaid initially stated that the defendant's arrest was an indication of his guilt. However, in response to questions posed by the attorneys, they both indicated that they understood the concept of "innocent until proven guilty" and that they would be able to follow the law. The trial court's comments clearly show that the court was satisfied that the jurors' perceived bias or partiality had been properly remedied through rehabilitation. This assignment lacks merit.
Ineffective Assistance of Counsel
The defendant contends his trial counsel was ineffective because he failed to file a motion to suppress the voice recording of the conversation between him and his brother, Denzel, while sitting in the back of the patrol car. The defendant argues that he and his brother were detained without probable cause; therefore, the voice recording should have been suppressed as "fruit of the poisonous tree." Further, the defendant maintains that the trial transcript reflects that he and his brother were detained merely because they were black males, which did not provide probable cause for a warrantless arrest under La. C. Cr. P. art. 213.[12]
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief ("PCR") in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930.
*1235 State ex rel. Bailey v. City of West Monroe , 418 So.2d 570 (La. 1982) ; State v. Ellis , 42,520 (La. App. 2 Cir. 9/26/07), 966 So.2d 139, writ denied , 2007-2190 (La. 4/4/08), 978 So.2d 325. A motion for new trial is also an accepted vehicle by which to raise such a claim. Id. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff , 416 So.2d 528 (La. 1982) ; State v. Willars , 27,394 (La. App. 2 Cir. 9/27/95), 661 So.2d 673.
After reviewing this record, we find that the issue of ineffective assistance of counsel is not adequately developed in the record and would be more properly raised in an application for PCR. The defendant's contention that the recording is inadmissible is based upon his assertion that it was recorded while he was being held in the patrol car without probable cause. Whether the defendant was being detained without probable cause is a fact-intensive inquiry and such an inquiry is missing from the record in this case. See State v. Miller , 2000-1657 (La. 10/26/01), 798 So.2d 947.
Consequently, we find that, in due course, the defendant may raise the issue of ineffective assistance of counsel on PCR. If warranted, the record can then be more fully developed at an evidentiary hearing, at which time the defendant's trial counsel will also be given the opportunity to provide an explanation for the decisions he made during the trial.
CONCLUSION
For the reasons set forth herein, we hereby affirm the defendant's conviction and sentence.
AFFIRMED.

Ms. Cockerham suffered multiple bruises to her left hand and arm, her left eye was cut and her right arm was broken and required surgery. The state submitted photographs of Ms. Cockerham's injuries.

The defendant's father's name is also Calvin Wooten.

In some portions of the record, Denzel Wooten's name is spelled "Denzal."

Mr. Wooten testified that the shotgun had been missing for two or three months.

Using an enlarged photograph of the Wooten property and its surrounding area, Det. Childress pointed out the location where the garbage bag was found. He estimated that the bag was located approximately 400 feet from the Wooten house.

At the time of the home intrusion, Chief Meredith was employed by the Caldwell Parish Sheriff's Office.

The prosecutor also informed Det. Childress that Calvin Wooten and Chief Meredith had both testified that he and Chief Meredith had searched the Wooten house on the night of the incident.

The jury was presented with evidence that the garbage bag came from the Wooten home because it contained mail addressed to members of the Wooten household.

La. C.E. art. 701 provides:
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

The record demonstrates that the defense utilized a peremptory challenge to exclude Marvin Bailey from the jury. Further, our review of the record reveals that it was Ray Bailey, not Marvin Bailey, whom the defendant challenged for cause due to a prior incident involving his mother-in-law.

Defense counsel objected to the state's attempt to rehabilitate the prospective jurors. The colloquy was as follows:
[Defense Counsel]: Your Honor, I just would object to the procedure of allowing the State to attempt to rehabilitate during voir dire . Usually, that's done on challenge for cause arguments. I would object to the procedure that was used, I feel like it's * * * fundamentally unfair.
THE COURT: [T]he concern I have is it might've been better for the Court to do that is that, you sorta [sic] led 'em [sic] up to the gate and you didn't take em [sic] through it. And, uh, they say, yeah I'd like to see him testify, or, yeah maybe it creates an impression that he's sitting here. But when they've said, I'll follow the law, I think a follow-up by you would've clarified it one way or the other. So, that, that was the reason I asked the question, or allowed the question. I think his answers probably did you more good than, than himself.
[Defense Counsel]: Okay.
THE COURT: So noted.
* * *

La. C. Cr. P. art. 213 provides, in pertinent part:
A. A peace officer may, without a warrant, arrest a person when any of the following occur:
(1) The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be made immediately or on close pursuit.
(2) The person to be arrested has committed a felony, although not in the presence of the officer.
(3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer.
(4) The peace officer has received positive and reliable information that another peace officer from this state holds an arrest warrant, or a peace officer of another state or the United States holds an arrest warrant for a felony offense.